(No. 50880.—

(Nos. 50980, 50981.—

THOMAS ANDERSON *et al.,* Appellants, v. WILLIAM WAGNER, Appellee.—CAROL C. WOODWARD, Indiv. and as Adm'r, Appellee, v. BURNHAM CITY HOSPITAL *et al.,* Appellants.

*Opinion filed October 2, 1979.—Rehearing denied March 28, 1980.*

Stephen O. Willoughby, of Decatur, for appellants.

Armstrong, Erickson & Davis, Ltd., of Decatur, for appellee.

Harry L. Kinser and Kenneth C. Robins, of Chicago (McLaughlin, Kinser & Bryant, of counsel), for *amicus curiae* Illinois Hospital Association.

Vance I. Kepley, of Reno, O'Byrne & Kepley, of Champaign, for appellant Burnham City Hospital.

Phillips, Phebus, Tummelson & Bryan, of Urbana (Hurshal C. Tummelson and Birch E. Morgan, of counsel), for appellant George Green.

Leonard M. Ring & Associates, of Chicago (Leonard M. Ring and Richard L. Wattling, of counsel), for appellee Carol C. Woodward.

Harry L. Kinser and Kenneth C. Robins, of Chicago (McLaughlin, Kinser & Bryant, of counsel), for *amicus curiae* Illinois Hospital Association.

MR. JUSTICE RYAN delivered the opinion of the court:

These consolidated cases involve the validity of section 21.1 of the Limitations Act (Ill. Rev. Stat. 1977, ch. 83, par. 22.1), which provides for a special limitation period for medical malpractice actions against physicians and hospitals. One panel of the Fourth District

Appellate Court in cause No. 50880, Anderson v. Wagner, held section 21.1 to be constitutional, with one justice dissenting. (61 Ill. App. 3d 822.) Another panel of the appellate court for the same district in cause Nos. 50980 and 50981, Woodward v. Burnham City Hospital, held section 21.1 unconstitutional, with one justice dissenting. (60 Ill. App. 3d 285.) We granted petitions for leave to appeal in both cases and consolidated them for hearing and opinion in this court.

On the date the complaints in these consolidated cases were filed, section 21.1 of the Limitations Act provided:

> "No action for damages for injury or death against any physician or hospital *** whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death for which damages are sought in the action, whichever of such date occurs first, but in no event shall such action be brought more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death.
>
> If the person entitled to bring the action is, at the time the cause of action occurred, under the age of 18 years, or insane, or mentally ill, or imprisoned on criminal charges, the period of limitations does not begin to run until the disability is removed." Ill. Rev. Stat. 1977, ch. 83, par. 22.1.

Plaintiffs Thomas and Marilyn Anderson filed a complaint in the circuit court of Macon County against defendant William Wagner, M.D., on June 23, 1977, alleging that the defendant had failed to inform the plaintiffs that Marilyn had tested positive for rubella in a first trimester pregnancy test given to her late in 1972. Plaintiffs also allege that defendant failed to inform them of the likelihood of mental retardation in a child born under these circumstances. On May 20, 1973, a child, who later proved to be mentally retarded, was born to

plaintiffs, who allege they did not discover the defendant's malpractice until January 26, 1976. The circuit court of Macon County dismissed the complaint on motion of the defendant, holding that section 21.1 barred the action. In an amended complaint filed subsequent to the dismissal, plaintiffs allege that the defendant had fraudulently concealed their cause of action from them, which concealment, they allege, tolled the running of the statute of limitations. The trial court held that the statute was not tolled and dismissed the amended complaint. As noted above, the appellate court, with one justice dissenting, affirmed.

Plaintiffs Charles and Carol Woodward filed suit against defendants Burnham City Hospital and two doctors for malpractice on December 30, 1976, alleging an erroneous diagnosis of tissue taken from plaintiff, Charles Woodward, on November 27, 1965. As a result of the erroneous diagnosis, massive steriod treatments were administered which, it is alleged, caused Charles Woodward to develop a condition known as steroid myopathy which necessitated the amputation of both legs and caused cataracts. Charles died after the complaint was filed and an amended complaint was filed by Carol Woodward as administrator of the decedent's estate and individually. It is alleged that the malpractice was first discovered in February 1976, when a sample from the preserved tissue taken in the 1965 biopsy was tested by another facility, which test demonstrated that the earlier diagnosis had been incorrect. The circuit court of Champaign County, in response to defendants' motion, dismissed the amended complaint, holding that the actions were barred by section 21.1 of the Limitations Act. As stated earlier, the appellate court, with one judge dissenting, reversed and held section 21.1 unconstitutional.

The plaintiffs contend that section 21.1 is unconstitutional for several reasons. First they say it violates the due process and equal protection clauses of both the Federal and State constitutions. The plaintiffs' primary contention

is, however, that section 21.1 violates article IV, section 13, of the Illinois Constitution of 1970 in that it is special legislation because it (1) sets medical malpractice apart from all other professional malpractice and (2) confers a special privilege upon only two classes of medical health providers, physicians and hospitals. Before considering these arguments, a survey of recent legislative enactments and judicial decisions relating to medical malpractice will be helpful.

I

It is generally agreed that in the early 1970's what has been termed a medical malpractice insurance crisis existed in most jurisdictions in this country. The crisis resulted from the increasing reluctance of insurance companies to write medical malpractice insurance policies and the dramatic rise in premiums demanded by those companies which continued to issue policies. The difficulty in obtaining insurance at reasonable rates forced many health-care providers to curtail or cease to render their services. The legislative response to this crisis sought to reduce the cost of medical malpractice insurance and to insure its continued availability to the providers of health care. By October 1975, 39 States had commissioned studies of the medical malpractice problem and 22 States had revised civil practice laws and rules in an attempt to remedy the problem. Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex. L. Rev. 759, 761 n.14 (1977); see generally American Bar Association, Report of the Commission on Medical Professional Liability (1977); United States Department of Health, Education and Welfare Publication No. (OS) 73–88, Medical Malpractice: Report of the Secretary's Commission on Medical Malpractice (1973); Illinois Insurance Laws Study Commission, Final Report to the Governor and 79th General Assembly 47-60 (1975) (medical malpractice).

Legislative efforts dealing with the malpractice crisis included a variety of changes in tort law principles. In

many instances direct limits were placed on the amount of recovery. The use of screening panels and arbitration was broadly recommended and followed, and certain procedural changes such as altering the statute of limitations were made. (See Medical Malpractice: The Duke L.J. Symp. 241-92 (1977); Comment, *Recent Medical Malpractice Legislation—A First Checkup,* 50 Tul. L. Rev. 655 (1976).) The Illinois General Assembly, in its effort to meet the crisis, adopted "An Act to revise the law in relation to medical malpractice" (Pub. Act 79—960, approved September 12, 1975, effective November 11, 1975). This act, in addition to amending section 21.1 of the Limitations Act, also created a medical review panel (Ill. Rev. Stat. 1975, ch. 110, par. 58.2 through 58.10) and limited the maximum amount of recovery in medical malpractice actions (Ill. Rev. Stat. 1975, ch. 70, par. 101).

This court, in *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, was one of the first State courts of final review to pass on the validity of a legislature's response to the malpractice crisis. In *Wright* this court held invalid the limitation on the amount of recovery and the provision relating to a medical review panel. That part of the new act amending the Limitations Act was not involved in that case.

It appears that few State courts of final review have followed the holding of *Wright,* though many courts and writers have discussed the case. (*Arneson v. Olson* (N.D. 1978), 270 N.W.2d 125 (limitation on amount of recovery held invalid) (*State ex rel. Cardinal Glennon Memorial Hospital for Children v. Gaertner* (Mo. 1979), 583 S.W.2d 107) (provision for reviewing panel held invalid).) Two lower courts in Ohio have held portions of the Ohio statute invalid. (*Simon v. St. Elizabeth Medical Center* (Ohio C.P. Montgomery County 1976), 3 Ohio Op. 3d 164, 355 N.E.2d ;903 (limitation on amount of recovery held invalid); *Grayley v. Satayatham* (Ohio C.P. Cuyahoga County 1976), 74 Ohio Op. 2d 316, 343 N.E.2d 832 (limitation on amount of recovery and

provision concerning a panel held invalid).) The Ohio Supreme Court, however, in *Amer v. Akron City Hospital* (Ohio 1976), 47 Ohio St. 2d 85, 351 N.E.2d 479, in a case not directly involving the validity of the shortened medical malpractice limitation period, stated that the enactment of such limitations was within the prerogative of the legislature. (*Amer v. Akron City Hospital* (Ohio 1976), 47 Ohio St. 2d 85, 91 n.4, 351 N.E.2d 479, 484 n.4.) Also, some trial courts in Tennessee have not applied the statute of that State providing for screening panels, finding that provision to be in violation of the Tennessee Constitution. (See Comment, *Constitutional Challenges to Medical Malpractice Review Boards,* 46 Tenn. L. Rev. 607, 632-44 (1979).) Recently the Florida Supreme Court, in two cases not yet reported, held unconstitutional the provisions of that State's malpractice statute which provided for screening panels. (6 Nat'l L.J. 3 (Mar. 17, 1980).) In addition to these cases holding medical malpractice legislation invalid, the Supreme Court of Idaho, in *Jones v. State Board of Medicine* (1976), 97 Idaho 859, 555 P.2d 399, reached a result which cannot be classified as sustaining or holding invalid the medical malpractice statute of that State. While it found that the Idaho act did not deny the plaintiff access to the courts, it nonetheless remanded the case for factual findings on a question of classification.

On the other hand, an overwhelming majority of courts have recognized the unique nature of medical malpractice problems and have upheld general medical malpractice statutes against numerous constitutional attacks. Many of the cases cited from other jurisdictions have either attempted to distinguish *Wright,* or have refused to follow it. (*Woods v. Holy Cross Hospital* (5th Cir. 1979), 591 F.2d 1164; *Hines v. Elkhart General Hospital* (N.D. Ind. 1979), 465 F. Supp. 421; *Eastin v. Broomfield* (1977), 116 Ariz. 576, 570 P.2d 744; *Carter v. Sparkman* (Fla. 1976), 335 So. 2d 802; *State ex rel. Schneider v. Liggett* (1978), 223 Kan. 610, 576 P.2d 221;

*McGuffey v. Hall* (Ky. 1977), 557 S.W.2d 401 (statute valid but certain limited aspects of it declared void because of State constitutional provisions); *Everett v. Goldman* (La. 1978), 359 So. 2d 1256; *Attorney General v. Johnson* (1978), 282 Md. 168, 385 A.2d 57; *Paro v. Longwood Hospital* (1977), 373 Mass. 645, 369 N.E.2d 985; *Prendergast v. Nelson* (1977), 199 Neb. 97, 256 N.W.2d 657; *Comiskey v. Arlen* (1976), 55 App. Div. 2d 304, 390 N.Y.S.2d 122; *Parker v. Children's Hospital* (1978), 483 Pa. 106, 394 A.2d 932; *State ex rel. Strykowski v. Wilkie* (1978), 81 Wis. 2d 491, 261 N.W.2d 434.) *Wright* has also been criticized by the writers. See, *e.g.*, Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications,* 55 Tex. L. Rev. 759 (1977); Comment, *Constitutional Challenges to Medical Malpractice Review Board,* 46 Tenn. L. Rev. 607 (1979); Note, *Medical Malpractice Mediation Panels: A Constitutional Analysis,* 46 Fordham L. Rev. 322 (1977); Note, *Wright v. Central Du Page Hospital Association: A Grim Prognosis for Medical Malpractice Review Panels?*, 22 S.D. L. Rev. 461 (1977); Note, *Recent Medical Malpractice Legislation—A First Checkup,* 50 Tul. L. Rev. 655 (1976).

The critics have read the holding in *Wright* too broadly. First, the case did not hold that all statutory provisions creating panels for the review of malpractice claims were unconstitutional. Second, the holding of *Wright* that the limitation on the amount of recovery is invalid is not inconsistent with the position taken by the American Bar Association Commission on Medical Professional Liability that no dollar limit on recoverable damages should be enacted which can operate to deny a plaintiff in a medical malpractice action full compensation for *economic* loss. (American Bar Association, Report of the Commission on Medical Professional Liability 145-46 (1977).) The court noted in *Wright* that, under the act being considered, the very seriously injured, because of the limitation, might be unable to recover even all of his

medical expenses. *Wright v. Central Du Page Hospital Association* (1976), 63 Ill. 2d 313, 327-28.

## II

We now turn to the consideration of the changes that were made in the limitation statutes as a part of the legislative response to the medical malpractice insurance crisis. Prior to that crisis few States had special limitation statutes for medical malpractice cases. Generally, the statutes of limitations applicable to personal injuries were followed, and occasionally, when the action was framed on an implied contract theory, a contract limitation period would be applied. A few States had statutes of limitations applicable to all types of malpractice and a few States had statutes of limitations specifically for medical malpractice. D. Harney, Medical Malpractice 247-70 (1973); 1 D. Louisell & H. Williams, Medical Malpractice sec. 13.01 *et seq.* (1977); Lillich, *The Malpractice Statute of Limitations in New York and Other Jurisdictions,* 47 Cornell L.Q. 339 (1962).

Increased use of the "discovery rule," beginning in the late 1960's, dramatically complicated the question of statutes of limitation, particularly in the field of medical malpractice. Under the discovery rule a cause of action accrued when a person learned of his injury or reasonably should have learned of it. With extensive application of the discovery rule to medical malpractice cases, statutes of limitations no longer constituted statutes of repose for a defendant in a malpractice action. By the application of the discovery rule a medical malpractice action was not deprived of its vitality simply by the passage of the statutory period. (As to the effect of the discovery rule on the statute of limitations in malpractice cases, see generally, Letvin, *In Search of the Spirit of Lipsey: Discovery of Malpractice and the Statute of Limitations,* 1978 S.I.U. L.J. 345; Scott, *For Whom The Time Tolls—Time of Discovery and the Statute of Limitation,* 64 Ill. B.J. 326 (1976); Note, *The Evolution of Illinois Tort Statutes*

*of Limitation: Where Are We Going and Why?* 53 Chi.-Kent L. Rev. 673 (1977); Comment, *The Time of Discovery Rule and the Qualified Privilege Defense for Credit Reporting Agencies in Illinois after World of Fashion v. Dun & Bradstreet, Inc.,* 10 J. Mar. J. Prac. & Proc. 359 (1977).)

Before considering other States' responses to the discovery-rule problem in medical malpractice, however, it is appropriate to consider the development of the Illinois statute of limitations as it relates to medical malpractice actions. In Illinois, prior to 1965, actions involving medical malpractice were governed by the general provisions of the Limitations Act. If the action was one for personal injury, the 2-year limitation period of section 14 of the Act (Ill. Rev. Stat. 1963, ch. 83, par. 15) was applied. In 1964 in *Mosby v. Michael Reese Hospital* (1964), 49 Ill. App. 2d 336, the plaintiff alleged that a surgical needle had been left in her body but that she did not discover this fact until 4 years later when she had a second operation. The trial court, relying on the 2-year statute of limitations, dismissed the plaintiff's complaint. The appellate court, although recognizing the wide application of the discovery rule in other areas, nonetheless affirmed the trial court. However, the appellate court expressed dissatisfaction with the result. At the next session of the General Assembly, section 21.1 was added to the Limitations Act (Ill. Rev. Stat. 1965, ch. 83, par. 22.1), providing in substance that where a foreign object has been introduced into a person's body and was negligently permitted to remain there the period of time within which an action must be brought would not begin to run until the person knew or should have known of this fact, with an outside 10-year limitation following the treatment or operation. Other than cases involving foreign objects, the 2-year provision of section 14 (Ill. Rev. Stat. 1965, ch. 83, par. 15) still applied. In 1970 in *Lipsey v. Michael Reese Hospital* (1970), 46 Ill. 2d 32, this court applied the discovery rule to a medical malpractice case not involving a foreign object left in the

patient's body and held that the cause of action did not accrue until the injured person learned of the injury or should have learned of it. Thus, after *Lipsey,* if a person had been injured by having a foreign object negligently left in his body, the maximum time within which a complaint could be filed was 10 years. Whereas, if the negligent act involved faulty diagnosis or a negligent act other than leaving a foreign object in the body, the cause of action did not arise until the patient learned of the injury or should have learned of it regardless of how long after the negligent act that may have been. Thus in 1975 the General Assembly, when it enacted Public Act 79–960, part of which was held unconstitutional in *Wright,* was faced with this discrepancy and as part of Public Act 79–960 amended section 21.1 of the Limitations Act by adding to its previous provisions concerning a foreign object a provision limiting the time within which other malpractice actions may be brought to 2 years. However, the statute further provided an outside time limit of 5 years for bringing this type of action in cases where the discovery rule was applicable. In 1976 section 21.1 was again amended deleting the special provisions concerning foreign objects left in the body and providing that all malpractice actions against physicians and hospitals arising out of patient care shall not be brought more than 2 years after the claimant knew or should have known of the existence of the injury but in no event more than 4 years after the date on which occurred the last act or omission alleged to have been the cause of such injury.

The discovery rule was thought to have played a significant role in the medical malpractice crisis. Because it created what came to be called the "long tail" of liability, the discovery rule reduced an insurance company's ability to predict future liabilities. (See Comment, *"Claims Made" Dilemma in Professional Liability Insurance,* 22 U.C.L.A. L. Rev. 925 (1975).) Responding to these problems, various State and national commissions recommended placing an outside limit on the discovery rule in medical

malpractice cases. See, *e.g.,* American Bar Association, Report of the Commission on Medical Professional Liability 140-43 (1977); Medical Injury Insurance Reparations Commission, Report and Recommendation to Governor Dan Walker and Members of the 79th General Assembly (Ill. 1976); Medical Malpractice: The Duke L.J. Symp. 253-54 (1977).

This interest in the discovery rule prompted a substantial number of States to enact limitation statutes placing an outside limit on the applicability of the discovery rule in medical malpractice cases. The various statutes differ in both length of time within which suit must be filed and the types of medical personnel or entities affected by the statute. A number of statutes apply to all "health care providers," comprehensively covering all medical malpractice actions. (Ala. Code 6—5—480 (1975) (4 Years); Ariz. Rev. Stat. sec. 12—564 (1978 Supp.) (3 years); Cal. Civ. Proc. Code sec. 340.5 (Deering 1979 Supp.) (3 years); Del. Code tit. 18 sec. 6856 (1978 Supp.) (3 years); Fla. Stat. Ann. sec. 95.11 (West 1979 Supp.) (7 years); Ga. Code Ann. secs. 3—1102, 3—1103 (1978 Supp.) (2 years); Ind. Code Ann. secs. 16—9.5—3—1, 16—9.5—3—2 (Burns Supp. 1978) (2 years); Kan. Civ. Proc. Stat. Ann. sec. 60—513 (Vernon 1976) (4 years); Md. Cts. & Jud. Proc. Code Ann. sec. 5—109 (1978 Supp.) (5 years); Nev. Rev. Stat. sec. 41A.097 (1977) (4 years); N.H. Rev. Stat. Ann. sec. 507—C:4 (1977 Supp.) (8 years); N.M. Stat. Ann. sec. 41—5—13 (1978) (3 years); N.Y. Civ. Prac. Law sec. 214—a (McKinney 1978-79 Supp.) (2 years, 6 months); Okla. Stat. Ann. tit. 76, sec. 18 (West 1978-79 Supp.) (only economic expenses allowed after 3 years); Or. Rev. Stat. sec. 12.110 (1977) (5 years); S.C. Code sec. 15—3—545 (1978 Supp.) (6 years); Tenn. Code Ann. sec. 23—3415 (1978 Supp.) (3 years); Tex. Rev. Civ. Stat. Ann. art. 4590i (Vernon 1978-79 Supp.) (2 years); Vt. Stat. Ann. tit. 12, sec. 521 (1978 Supp.) (7 years).) Other statutes attempt to enumerate specific groups of medical personnel or facilities; although not

applying to all "health care providers" or health facilities, they, nonetheless, cover a broad spectrum. (Colo. Rev. Stat. sec. 13—80—105 (1978 Supp.) (3 years); Haw. Rev. Stat. sec. 657—7.3 (1978 Supp.) (6 years); Iowa Code Ann. sec. 614.1 (1979-80 Supp.) (6 years); Mich. Comp. Laws Ann. sec. 600.5838 (1979-80 Supp.) (action accrues when alleged tortfeasor ceases treating plaintiff, regardless of time of discovery); Mo. Ann. Stat. sec. 516.105 (1979 Supp.) (10 years); Mont. Rev. Codes Ann. sec. 93—2624 (1977 Supp.) (5 years); S.D. Comp. Laws Ann. sec. 15—2—14.1 (1978 Supp.) (2 years); Utah Code Ann. sec. 78—12—28 (1975 Supp.) (10 years); Wash. Rev. Code Ann. sec. 4.16.350 (1978 Supp.) (8 years).) However, another group of statutes provides protection to a very limited group of medical personnel or facilities and usually excludes nurses and a substantial body of medical personnel and health-care facilities that could be involved in malpractice litigation. The Illinois statute falls into this group. (Conn. Gen. Stat. Ann. sec. 52—584 (West 1979) (3 years); Ky. Rev. Stat. Ann. sec. 413.140 (Baldwin 1978) (5 years); La. Rev. Stat. Ann. art. 9:5628 (1977 Supp.) (3 years); N.D. Cent. Code sec. 28—01—18 (1977 Supp.) (6 years); Ohio Rev. Code Ann. sec. 2305.11 (Baldwin 1978) (4 years).) Some States have previously had medical malpractice limitation statutes which applied only to a limited group and have substantially broadened the application of these statutes. (Compare the Colorado statute above to the statute involved in *McCarty v. Goldstein* (1962), 151 Colo. 154, 376 P.2d 691.) Two States have statutes which protect against claims for all types of professional malpractice. (See Neb. Rev. Stat. sec. 25—222 (1975) (10 years); N.C. Gen. Stat. sec. 1—15 (1977 Supp.) (4 years).) We do not suggest that these statutes represent the total legislative activity in this area. They do show, however, that a substantial majority of the States have felt that the discovery rule should be limited by prescribing a maximum time within which a malpractice action must be commenced regardless of when the injury is discovered.

The Illinois malpractice limitation statute—as it now stands in relation to the time within which actions must be filed—generally follows the time limitation specified in the statutes of other States. However, as noted above, there is a wide variance as to the classes of health-care providers who are covered by the statutes. Our statute falls within the group which does not extend the protection of the statute to all classes of health-care providers who could be the subject of medical malpractice actions. Protection is afforded by our statute only to *physicians and hospitals*.

The various limitation statutes of the other States relating to malpractice have been challenged on a variety of constitutional grounds including equal protection, due process and special legislation. All of the cases that our research found have sustained the validity of the statutes. Whether the statute is broad and covers all malpractice actions (*Taylor v. Karrer* (1976), 196 Neb. 581, 244 N.W.2d 201), or applies to all types of medical malpractice or all groups of health-care providers (*Landgraff v. Wagner* (1976), 26 Ariz. App. 49, 546 P.2d 26; *Harrison v. Schrader* (Tenn. 1978), 569 S.W.2d 822; *Duffy v. King Chiropractic Clinic* (1977), 17 Wash. App. 693, 565 P.2d 435; *Chaffin v. Nicosia* (1974), 261 Ind. 698, 310 N.E.2d 867), or whether the statute applies only to limited and specific groups of those who provide health care (*Sellers v. Edwards* (1972), 289 Ala. 2, 265 S.2d 438; *McCarty v. Goldstein* (1962), 151 Colo. 154, 376 P.2d 691; *Laughlin v. Forgrave* (Mo. 1968), 432 S.W.2d 308), the statute has been consistently upheld against the charge that the classifications have been discriminatory or unreasonable and constituted a denial of equal protection or constituted special legislation in favor of a class protected. The reasoning of these cases can be summarized by the language of this court in *Hamilton Corp. v. Alexander* (1972), 53 Ill. 2d 175, 179:

> "The equal-protection clause does not prevent a State from adjusting its legislation to differences in situations. A statute effecting the

classifications of persons or objects is not unconstitutional merely because it affects one class and not another, provided that it affects all members of the same class alike; so long as the classification is not arbitrary and is founded upon some substantial difference in circumstances or conditions properly related to the classification."

(We will more particularly discuss the propriety of the classifications in our statute below when we consider the plaintiffs' arguments concerning special legislation.)

The plaintiffs also contend, in an unarticulated due process argument, that under section 21.1 it is possible that a person's cause of action may be barred by the 4-year-maximum time limit before he learns of his injury. This problem is not directly involved in these cases. However, in *Laughlin v. Forgrave* (Mo. 1968), 432 S.W.2d 308, *Owen v. Wilson* (1976), 260 Ark. 21, 537 S.W.2d 543, and *Landgraff v. Wagner* (Ariz. App. 1976), 546 P.2d 26, the statutes had run before the plaintiffs became aware of their injuries. In those cases the validity of the statutes was challenged as constituting a violation of the plaintiffs' right to due process of law. The courts in those cases noted that the period provided in the statutes was a reasonable time within which to require a complaint to be filed. The Supreme Court of Arkansas in *Owen v. Wilson* stated:

"Any statute of limitations will eventually operate to bar a remedy and the time within which a claim should be asserted is a matter of public policy, the determination of which lies almost exclusively in the legislative domain, and the decision of the General Assembly in that regard will not be interfered with by the courts in the absence of palpable error in the exercise of the legislative judgment." (*Owen v. Wilson* (1976), 260 Ark. 21, 24-25, 537 S.W.2d 543, 545.)

The court held that a claimant is not denied due process of law where a reasonable period of limitation has barred the claim without awareness by the claimant that he has been

injured. Also, in *Dunn v. Felt* (Del. 1977), 379 A.2d 1140, the statute of limitations had run prior to the plaintiff's discovery of his injury. The statute was challenged as being in violation of the Delaware Constitution; however, the court sustained the validity of the act, stating:

"The authority of the General Assembly in enacting statutes of limitation is quite broad and limited only by a rule of reason. [Citations.] I cannot say that the 3 year limitation found in 18 Del. C. section 6856 is unreasonable." *Dunn v. Felt* (Del. 1977), 379 A.2d 1140, 1141.

Although such a result—a cause of action barred before its discovery—seems harsh and unfair, the reasonableness of the statute must be judged in light of the circumstances confronting the legislature and the end which it sought to accomplish. We have noted above that various reports, commissions, and authors recommended that the "long tail" exposure to malpractice claims brought about by the discovery rule be curtailed by placing an outer time limit within which a malpractice action must be commenced. The 4-year limit of our present statute follows the recommendations of the Medical Injury Reparations Commission contained in its report to the Governor and the 79th General Assembly cited above. This recommendation was made following extensive hearings by the Commission. Our 4-year time limit is also within the general area of limits that had been set by other States. Some are shorter than ours, and some are longer. It has not been demonstrated that the legislative action in establishing the 4-year outer limit within which to file a complaint for medical malpractice is unreasonable. We thus find no due process violation.

III

We turn now to the main thrust of the plaintiffs' argument. The appellate court in one of our cases, *Woodward v. Burnham City Hospital,* held that section 21.1 of the Limitations Act constituted special legislation in violation of section 13 of article IV of the Illinois

Constitution of 1970. That section of our constitution provides:

> "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter for judicial determination."

The court held that the act conferred a special benefit upon physicians and hospitals while denying it to all other groups of health-care providers. This, the court held, was unfair, unjust and arbitrary and constituted special legislation in violation of section 13 of article IV of the Constitution of 1970.

The history of the special legislation prohibition of section 22 of article IV of the Constitution of 1870 is exhaustively set forth in G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 203-26 (1969). Since this book was prepared for the 1970 Illinois Constitution Study Commission, its analysis is most helpful. Section 22 once contained a long list of specific prohibitions, the original purposes of which were lost sight of long ago. The 1870 Constitution, however, contained no equal protection clause and the authors note at page 221 that the last enumerated prohibition, which concerned the granting of special privileges, came to be used by the courts as Illinois' version of the fourteenth amendment's equal protection clause. (See also, *Schuman v. Chicago Transit Authority* (1950), 407 Ill. 313, 317.) Authors Braden and Cohn recommended omitting from the draft of any new constitution adopted by the 1970 constitutional convention the list of specific prohibitions of special and local laws that had been in the 1870 Constitution. They also recommended including in the new constitution an equal protection clause. To support their recommendation, the authors pointed out the difference between "real" special legislation, such as that specifically prohibited in the prior constitution which had ceased to be a problem, and nonreal special legislation. Nonreal special legislation was simply general legislation

challenged on equal protection grounds. They felt that, though the legislature no longer attempted to enact "real" special legislation, the prohibition against the enactment of special legislation should be retained in the constitution in general terms to guard against any attempt to do so. (G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 226 (1969).) Braden and Cohn also noted that section 22 of article IV of the 1870 Constitution contained, just after the specific prohibitions, a catch-all statement: "In all other cases where a general law can be made applicable no special law shall be enacted." The authors stated that this provision had been construed as vesting in the legislature and not the courts the authority to say if a general law was applicable. (G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 222 (1969).) They suggested that with the inclusion in a new constitution of a general prohibition against special legislation there should also be included a provision authorizing judicial control over a legislature bent on evading the Constitution's provision. Finally, it was suggested that the provision of the model State constitution covering special legislation would accomplish these suggested ends. The drafters of the 1970 Illinois Constitution closely followed Braden's and Cohn's advice. Section 13 of article IV of the 1970 Constitution is almost identical to section 4.11 of article IV of the model State constitution. G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 224, 225 (1969).

In *Bridgewater v. Hotz* (1972), 51 Ill. 2d 103, the court, in construing section 13 of article IV of the Constitution of 1970, pointed out that the new constitution rejected the previous rule allowing the legislature to determine whether a general law could be made applicable. This court stated, however, that though the scope of judicial review of legislation is enlarged to that extent, section 13 of article IV requires no change in the definition of what is "general and uniform," "special," or

"local." *Bridgewater* then applied traditional equal protection tests, tests which this court had used prior to the 1970 Constitution. If there is a reasonable basis for differentiating between the class to which the law is applicable and the class to which it is not, the General Assembly may constitutionally classify persons and objects for the purpose of legislative regulation and control. Furthermore, if the classification bears a reasonable and proper relation to the purposes of the act and the evil it seeks to remedy, it does not violate the constitutional proscription on special or local laws. "Whether the course chosen is wise or whether it is the best means to achieve the desired result it is not a proper subject of judicial inquiry." *Bridgewater v. Hotz* (1972), 51 Ill. 2d 103, 111.

Subsequent to *Bridgewater,* this court has continued to evaluate the validity of legislative classifications by the above tests. In addition the court has applied these tests interchangeably, whether the court had under consideration an equal protection question (*Fujimura v. Chicago Transit Authority* (1977), 67 Ill. 2d 506, 512; *Hamilton Corp. v. Alexander* (1972), 53 Ill. 2d 175, 179), or a special legislation challenge (*Kobylanski v. Chicago Board of Education* (1976), 63 Ill. 2d 165). In fact, in *S. Bloom, Inc. v. Mahin* (1975), 61 Ill. 2d 70, 77, this court stated that the Illinois Constitution of 1870 contained no equal protection clause, "but similar standards are applied to determine violations of the special legislation provision ***." Thus, though section 13 of article IV of the Constitution of 1970 gives the court enlarged judicial review in the narrow area of "real" special legislation, traditional deference is given to legislative classification in this area as well as when the court is considering equal protection questions in the guise of special legislation challenges. See generally Turkington, *Equal Protection of the Laws in Illinois,* 25 De Paul L. Rev. 385, 410-22 (1976); Whalen & Wolff, *Constitutional Law: The Prudence of Judicial Restraint Under the New Illinois Constitution,* 22 De Paul L. Rev. 63, 77-79 (1972); Comment,

*Medical Malpractice Statute of Limitations as Special Legislation,* 55 Chi.-Kent L. Rev. 519 (1979).

The plaintiffs in this action rely heavily upon several of our frequently discussed special legislation cases. (*Grace v. Howlett* (1972), 51 Ill. 2d 478; *Skinner v. Anderson* (1967), 38 Ill. 2d 455 (this case will be discussed at length below); *Harvey v. Clyde Park Dist.* (1964), 32 Ill. 2d 60.) In fact, however, these cases illustrate the equal protection classification test outlined above. Though these cases were phrased in special-legislation language, they clearly applied an equal protection standard. Although the statutes in each case operated uniformly on all members of a class, no sound basis or rational reason existed for treating that particular class as separate from other classes for the purposes of legislation. In the cases now before us there clearly is a sound and rational basis for the classification at issue.

Plaintiffs in the Woodward case first contend that the limitations statute violates section 13 of article IV because it sets medical malpractice actions apart from other professional malpractice actions. This contention has no merit. When it enacted this statute, the legislature was directly addressing itself to a medical malpractice problem. Its action was supported by recommendations of numerous commissions and authors that the "long tail" of the discovery rule be curtailed by adding to the limitation period an outer time limit within which medical malpractice actions must be filed. Our legislature's action is also supported by reference to many other jurisdictions. The legislatures of many other States have enacted similar limitations on medical malpractice actions. These statutes have been upheld uniformly by courts of review. These statutes and these cases have been set out above at length. Thus we must conclude that there was a reasonable attempt to remedy what the legislature perceived to be a medical malpractice insurance crisis. Whether the course was wise or the best means of accomplishing the result desired is a matter for legislative determination.

*Bridgewater v. Hotz* (1972), 51 Ill. 2d 103.

A more difficult question concerning the legislative classification does exist, however: Is there a reasonable basis for differentiating between the class to whom the statute applies (physicians and hospitals) and other groups of providers of health care to whom this statute does not apply? We have noted earlier in this opinion that there is a wide variance in the statutes of the different States as to the health-care providers covered by their statute of limitations. Our statute is one of the more narrow. However, whether the statute covers all medical personnel or particular groups within the broader class, the courts in the cases cited above have upheld the classifications of the legislatures.

The crisis which confronted the legislatures in the mid-1970's concerned the rapid increase in the premiums for medical malpractice insurance by some companies and the withdrawal of other insurance companies from the medical malpractice insurance field. The object of the legislation was to insure the continued availability of this type of insurance to those who were affected by the crisis and thus to insure the continuation of health services from these affected groups. Much empirical data has established that physicians and hospitals must be set apart from other members of the health-care class insofar as medical malpractice insurance is concerned. The National Association of Insurance Commissioners, an association of the insurance departments of the various States, in 1977 published "NAIC Malpractice Claims," which reflects that claims against physicians and surgeons constituted 59% of all claims paid by count and 73% of the total amount of all claims that were paid. Claims against hospitals composed 36% of all claims paid by count and 25% by amount. Thus physicians and hospitals together accounted for 95% of the total number of medical malpractice claims and 98% of the dollar amount of those claims paid. In Report and Recommendation of the Medical Injury Insurance Reparations Commission to Governor Dan Walker and Members

of the 79th General Assembly (Ill. 1976), a special legislative commission report sets out a table compiled by the National Association of Insurance Commissioners reflecting claims closed after July 1, 1975, showing that of a total of 3,298 claims, 1,815 were against physicians and surgeons and 1,288 were against hospitals. (Report at 20.) In a section of the above report headed "The Impact of Malpractice Claims on the Insurance Mechanism and Health Care Delivery System," the report states in summary:

> "At the present time, the malpractice crisis has not reached these other health care providers to the same degree that it has reached hospitals and physicians, although the self-employed podiatrist seems to be approaching the problem." Report at 29.

What is more, much constitutionally valid classification already exists in the medical field, based on the obvious difference between different types of medical professionals. The dissenting judge in the appellate court decision in *Woodward v. Burnham City Hospital* (1978), 60 Ill. App. 3d 285, 289, pointed out that the legislature had already classified various groups of medical personnel and hospitals and institutions for purposes of licensing and regulation. Recently the United States Supreme Court sustained an extreme example of classification in this field. In *Friedman v. Rogers* (1979), 440 U.S. 1, 59 L. Ed. 2d 100, 99 S. Ct. 887, the court upheld the Texas legislature's right to differentiate between two different groups of optometrists, each group having identical training, education, and licensing standards. Both groups practiced the profession; however, one group was self-employed and the other was not. The legislature had given one group of optometrists special preference in representation on a board. The court concluded that the classification reasonably related to the legitimate purpose of the Act.

We conclude that there was a reasonable basis for differentiating between physicians and hospitals and other

members of the general class of health-care providers for the purpose of this particular legislation. The General Assembly in responding to the medical malpractice insurance crisis drew the statute very narrowly and encompassed within the classification to whom the statute applied only those segments of the health-care providers most acutely affected by the crisis. (In effect, our limited statute thus preserves far more of the discovery rule than the comprehensive health-care-provider statutes cited earlier.) " 'If the law presumably hits the evil where it is most felt, it is not to be overthrown merely because there are other instances to which it might have been applied.' [Citations.] " (*Youhas v. Ice* (1974), 56 Ill. 2d 497, 502.) "We would also remark that so far as legislative classification is concerned, it has been recognized that evils in the same field may be of different dimensions and reform may take one step at a time. The legislature may address itself to one stage of a problem and not take action at the same time as to other phases." *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 312-15.

The appellate court in *Woodward v. Burnham City Hospital* found *Skinner v. Anderson* (1967), 38 Ill. 2d 455, controlling, and the plaintiffs now in this court rely heavily on that decision. In *Skinner v. Anderson* this court held invalid section 29 of the Limitations Act, which was added by an amendment in 1963. (Ill. Rev. Stat. 1965, ch. 83, par. 24(f).) The amendment purported to immunize architects and contractors from liability upon causes of action that did not accrue within 4 years after the architect or contractor performed his services. This court held that the statute granted to architects and contractors a special and exclusive immunity and thus constituted a violation of section 22 of article IV of the Constitution of 1870. The court pointed out that of all of those whose negligence in connection with the construction of a structure might result in injury to a person that statute singles out only the architect and contractor and grants

them immunity. This court stated, however, that though section 22 of article IV of the Constitution of 1870 did not prohibit legislative classification, it did require that the legislation be reasonably related to the legislative purpose. Where that relationship is nonexistent the statute contravenes the constitutional prohibition. The court also stated:

> " 'That the statute operates uniformly upon all members of a class created as the beneficiaries of the act is not the sole test to be applied, but in order to avoid the constitutional inhibition *** it must also appear that there is a sound basis, in reason and principle, for regarding the class of individuals as a distinct and separate class for the purpose of the particular legislation.' [Citation.]" (38 Ill. 2d 455, 461.)

We do not agree that *Skinner v. Anderson* is controlling. No doubt a general statute of limitations which was not limited in its applicability to only physicians and hospitals but applied to all personnel and institutions administering health care would have achieved whatever end this legislative response to the medical malpractice insurance crisis was seeking to achieve. In fact, a statute of limitations that would apply to all professional malpractice cases would have achieved the result. The sentence in section 13 of article IV of our constitution—Whether a general law is or can be made applicable shall be a matter for judicial determination—does not prohibit classification of persons and objects. As noted in *Skinner v. Anderson,* however, the classifications must be reasonably related to the legislative purpose and it must appear that there is a sound basis for regarding the class as distinct and separate for the purpose of the legislation. Our analysis of the statute in our earlier discussion of the classification issue compels us to hold that the statute is not defective when judged by the standards of *Skinner v. Anderson.*

Our conclusion that *Skinner v. Anderson* does not control is emphasized by a recent case. In *Fujimura v.*

*Chicago Transit Authority* (1977), 67 Ill. 2d 506, the court upheld the validity of a statute which required that within 6 months from the date of the injury anyone about to commence an action against the Chicago Transit Authority because of the injury must file a statement with the Authority. Statutes regarding similar notice to other governmental units required that the same be given within 1 year. This court, applying the traditional equal protection analysis, found that there was a rational basis for supporting a shorter notice period and statute of limitations for the transit authority.

IV

Having concluded that section 21.1 of the Limitations Act (Ill. Rev. Stat. 1977, ch. 83, par. 22.1) is not special legislation within the proscription of section 13 of article IV of the Constitution of 1970, we turn to several remaining issues in the Anderson case. After the trial court had dismissed plaintiffs Andersons' original complaint, an amended complaint was filed. It is argued that the amended complaint is based on the theory that the defendant had fraudulently concealed his negligent acts from the plaintiffs. Plaintiffs now contend that section 22 of the Limitations Act (Ill. Rev. Stat. 1975, ch. 83, par. 23) tolled the running of the time limitation of section 21.1. Section 22 provides:

"If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within five years after the person entitled to bring the same discovers that he has such cause of action, and not afterwards."

Although the trial court held that the allegations of fraudulent concealment were sufficient, it nonetheless held that the cause of action was barred by section 21.1.

The complaint alleges that plaintiff Marilyn Anderson was a patient of the defendant from September 1972 through May 1973. The child was born on May 20, 1973. The complaint was filed June 23, 1977. It is alleged that

the plaintiffs discovered the acts complained of on January 26, 1976. Applying the 4-year maximum limitation period of the medical malpractice limitation statute (section 21.1) the earliest date on which the action would be barred would be the first part of September 1976, and the latest date would be the last part of May 1977. Thus after the plaintiffs discovered the basis for their cause of action on January 26, 1976, the statute of limitations had not run and would not run for a minimum of 7 months or a maximum of 16 months. If at the time the plaintiff discovers the "fraudulent concealment" a reasonable time remains within the applicable statute of limitations, section 22 of the Limitations Act does not toll the running of the limitation period. (*Skrodzki v. Sherman State Bank* (1932), 348 Ill. 403, 407, 409; *Solt v. McDowell* (1971), 132 Ill. App. 2d 864, 867.) We cannot say that the trial court erred in holding that plaintiffs' cause of action was barred. It appears that had they exercised diligence after discovery of the alleged fraud their action would not have been barred by the statute.

By discussing section 22 of the Limitations Act we do not hold that it is applicable in medical malpractice cases. That question is not before us. There are, however, uncertainties concerning the applicability of section 22 of the Limitations Act which we need not resolve in this opinion but to which we invite the attention of the General Assembly.

V

The Andersons raise one final issue. Their complaint alleges that Mrs. Anderson was under the care of the defendant from September 1972 through May 1973. There is no specific allegation as to when the rubella test was given, when the fetus became viable, or when any of the defendant's negligent acts occurred. It is specifically alleged that the child was born May 20, 1973, and the plaintiffs have focused on that date as the date of injury. This appears to have been accepted by the defendant and

by the trial court. Applying the present 4-year limitation period of section 21.1, the action had to be filed by May 20, 1977. It was not filed until June 23, 1977. However, prior to September 19, 1976, section 21.1 provided that a medical malpractice action had to be filed within 2 years after the discovery of injury but in no event more than 5 years after the date of the act or omission. The Andersons now argue that since they did not discover that they had a cause of action against the defendant until January 26, 1976, they did not have a reasonable time after the effective date of the amendment to section 21.1 within which to file their complaint. They acknowledge that the legislature may shorten the time within which an action must be filed and that the shortened period will apply to existing claims provided a reasonable time remains within which to file the complaint. They now complain the trial court failed to conduct a hearing as to whether a reasonable time had been afforded them within which to bring their action.

The complaint contains no allegation that the Andersons did not have a reasonable time under the 1976 amendment within which to bring their action. They did not request a hearing on this question in the trial court. There is no indication in the order of the court that it did not consider the reasonableness of the time. Accepting the Andersons' argument that the limitation period ran from the birth of the child, the shortened 4-year limitation period did not expire until May 20, 1977, 8 months after September 19, 1976, the effective date of the amendment; 9 months after its adoption on August 20, 1976; and 16 months after they alleged that they learned that they had a claim against the defendant. Under these facts we cannot say that the trial court erred in applying the shortened limitation period of the 1976 amendment to section 21.1.

For the reasons given above, the judgment of the appellate court is affirmed in cause No. 50880, Anderson v. Wagner. As to cause Nos. 50980 and 50981, Woodward

v. Burnham City Hospital, the judgment of the appellate court is reversed and the judgment of the circuit court of Champaign County is affirmed.

*50880 — Judgment affirmed.*

*50980, 50981 — Appellate court reversed; circuit court affirmed.*