809 F.2d 413
 HERGET NATIONAL BANK OF PEKIN, First National Bank of
Peoria, and First National Bank & Trust Company of
Pekin, Plaintiffs-Appellants,
v.
USLIFE TITLE INSURANCE COMPANY OF NEW YORK, Defendant-Appellee.
 Nos. 85-2693, 85-2694.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 10, 1986.
Decided Jan. 13, 1987.
Rehearing and Rehearing En Banc Denied Feb. 27, 1987.
 
 Louis E. Miller, Frings, Bagley, Atherton & Clark, Pekin, Ill., for plaintiffs-appellants.
 John A. Slevin, Vanachen, Cation, Lawless, Trager & Slevin, Peoria, Ill., for defendant-appellee.
 Before WOOD and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 RIPPLE, Circuit Judge.
 
 
 1
 The appellants, Herget National Bank of Pekin, First National Bank of Peoria and First National Bank & Trust Company of Pekin (Banks), appeal the district court's decision to set aside a jury verdict in their favor and grant the appellee, USLife Title Insurance Company of New York (USLife), judgment notwithstanding the verdict (judgment n.o.v.). We affirm the judgment of the district court.
 
 
 2
 * Facts
 
 A. The Underlying Transactions
 
 3
 The complicated factual framework of this case was meticulously detailed by the district judge in his decision granting summary judgment in favor of USLife on counts II and III of the complaint:
 
 
 4
 In April of 1977 the president of the local UAW [United Auto Workers] union wrote various banks in the Peoria area announcing the construction of the Schor House and introducing the mortgage-banking firm of Samuel T. Isaac and Associates, Inc. ("Isaac and Assoc."). Shortly thereafter, Samuel Isaac, as president of Issac [sic] and Assoc., wrote each of the Banks enclosing a resume of the project, a sample commitment letter, and various other documents. In April or early May of 1977, each Bank sent a commitment letter to the UAW in care of Isaac and Assoc. These letters were accepted by Samuel Isaac. The letters contained the following clause:
 
 
 5
 "The maturity of our mortgage will be the same as the expiration date of the Government National Mortgage Association commitment. However, the loan is to be closed as soon as construction has been completed."
 
 
 6
 Herget National Bank was also requested to lend $250,000 for equity financing. On June 8, 1977, the vice president of the Herget Bank wrote the UAW approving of this equity loan. On June 22, Isaac and Assoc. wrote to the participating Banks and informed them that they would be advised as soon as the date was set for the "Initial Endorsement" and that loan closing documents were being prepared and would be sent upon completion.
 
 
 7
 On June 29, 1977, the UAW and the building contractor requested permission to commence construction prior to the Initial Endorsement. This request was later signed by Samuel Isaac on behalf of Isaac and Assoc., as mortgagee, and was approved by the regional director of HUD. On July 14, HUD wrote the UAW stating that HUD would insure the mortgage note on the project.
 
 
 8
 On September 14, Samuel Isaac, as president of Isaac and Assoc., sent a memo to the participating Banks announcing that on Friday, September 16, the early start would be approved by the FHA and that the final $1,723,700 would be funded by the Illinois Housing Development Authority. Isaac also stated that all funds would be disbursed by Bluegrass Titles, Inc. ("Bluegrass").
 
 
 9
 Bluegrass was a wholly owned subsidiary of Isaac and Assoc. and an authorized agent for U.S. Life for the purpose of writing title insurance. Bluegrass and Isaac and Assoc. shared the same office building and the same directors. At the time the events in this lawsuit occurred, Samuel Isaac was president of Isaac and Assoc. and senior vice president of Bluegrass. Oran McFarlan was president of Bluegrass and senior vice president of Isaac and Assoc. The two corporations used their respective stationery interchangeably on a regular basis in their correspondence, including their correspondence with U.S. Life.
 
 
 10
 On September 20, U.S. Life issued an insured closing service letter to each participating Bank stating that the Banks were protected if they sustained any loss from Bluegrass failing to follow their written closing instructions or from any fraud or dishonesty on the part of Bluegrass. On September 26, Samuel Isaac, as president of Isaac and Assoc., wrote Oran McFarlan of Bluegrass, enclosing a copy of FHA Form 2403 and directing disbursement after the title policy had been updated to the date and hour of the draw. FHA Form 2403 on its face indicates that certain disbursements would be paid to the Government National Mortgage Association ("GNMA") because there existed a commitment from GNMA to provide a takeout loan. The form was executed on behalf of Isaac and Assoc. by Oran McFarlan.
 
 
 11
 On September 29, Isaac and Assoc. sent a Participation Agreement to each of the participating Banks. The Banks were also sent Participation Reports, which were certificates as to the Bank's participation in the loan. On October 4, Isaac and Assoc. directed a memo to the participating banks enclosing FHA Form 2403, and requesting execution of the Participation Agreement and written confirmation that the money would be wire transferred to Bluegrass on October 12.
 
 
 12
 The loan was closed on October 13, 1977. A first mortgage was given to Isaac and Assoc. which secured a mortgage note of the same date to Isaac and Assoc. in the amount of $6,073,700. By previous commitment between the Plaintiff Banks and Isaac and Assoc., the Banks participated in the loan although they were not mortgagees of record. On October 13, the Banks made a combined initial advance of $530,183.75. These funds were wire transferred to Bluegrass. The funds wired by the Banks were disbursed by Bluegrass in accordance with the written directions given to Bluegrass by Samuel Isaac as president of Isaac and Assoc. No separate written instructions were sent by the Banks to Bluegrass. Bluegrass made no disbursement to GNMA. Instead, Bluegrass disbursed the money designated for the GNMA fee to Isaac and Assoc. On October 20, Samuel Isaac sent to the participating Banks a list of the closing documents and copies of the actual documents used at the loan closing.
 
 
 13
 R.30 at 2-5.
 
 
 14
 On or about February 1, 1979, the Banks learned that GNMA had never made a commitment for permanent financing. The Banks believed, therefore, that they were locked-in to loans at the interest rate of eight percent per annum. The Banks brought suit in state court against Samuel Isaac and Isaac and Assoc. This litigation was eventually settled. In exchange for the note and mortgage, the Banks, inter alia, released Mr. Isaac and his corporation from "any and all claims or causes of action."
 
 
 15
 To secure substitute permanent financing of the Schor House project to replace the construction loans, the Banks arranged for the sale of City of Pekin Industrial Revenue Bonds. By May 28, 1982, the Banks had recovered all of their investments plus interest. However, they claimed that they had also incurred substantial loss of the income that they could have earned had the money been repaid by the end of the originally contemplated contract period instead of the five years that it actually took for the loans to be repaid. They also claimed that they incurred significant attorneys' fees and related expenses throughout this process. Notice of claim was not given to USLife until March 1982, just before the Banks and Isaac reached a settlement and executed mutual releases.
 
 B. The Present Litigation
 
 16
 Three suits were filed by the Banks in December 1982 in Illinois state court. In January 1983, the suits were consolidated and removed to the United States District Court for the Central District of Illinois, Peoria Division. The Banks' three-count complaint against USLife alleged breach of contract (count I); conversion of funds (count II); and fraud (count III). In March 1984, the district court granted USLife's motions for summary judgment as to counts II and III on the ground that the claims were time-barred. Count I was tried to a jury, which reached a verdict in favor of the Banks. The jury, in answer to special interrogatories, found that the Banks had proved that they had accepted in writing the insured closing service offered by USLife, and that Bluegrass Titles, Inc. acted fraudulently or dishonestly as to all the plaintiffs. R.65. Damages were computed as follows: (1) First National Bank & Trust Company--$97,737.68; (2) Herget National Bank--$48,868.84; and (3) First National Bank of Peoria--$48,868.84. R.66.
 
 
 17
 USLife timely filed a motion for judgment n.o.v. or, in the alternative, for a new trial. On September 3, 1985, the district court granted the judgment n.o.v. R.78. The court concluded that the evidence, viewed in a light most favorable to the Banks, was insufficient to support a finding that the plaintiffs had accepted the insurance offer. The district court also agreed with USLife's argument that the Banks had suffered no loss of settlement funds:
 
 
 18
 This Court ruled at the close of all the evidence that "settlement funds" are those funds actually transmitted by the Banks to the title company and the coverage against the loss of those funds does not include damages sustained by the payment of attorney's fees, expenses incurred in connection with bringing the loan to closing, or indirect losses, such as loss of profits.
 
 
 19
 R.77 at 4; see Tr. Vol. V at 33. Thus, even if the offer of insurance had been accepted, the insurance extended only to the "settlement fund" as defined by the court. Because there was no loss remaining from disbursement of the settlement funds, the district court concluded that USLife was entitled to judgment n.o.v. This appeal followed.
 
 II
 Analysis
 
 20
 The major issues presented for review are 1) whether the jury's finding that the Banks suffered a loss of settlement funds was supported by the evidence, and 2) whether the district court properly granted summary judgment on the fraud count based upon the statute of limitations.
 
 A. Loss of Settlement Funds
 
 21
 1. The Trial Record and the District Court's Ruling
 
 
 22
 At trial, the Banks contended that they suffered a loss of settlement funds insured by USLife. The evidence established that the Banks had advanced $4 million in settlement funds to finance construction of the Schor House development; the evidence also established that the Banks recouped $4 million plus interest once permanent financing was secured. The Banks have admitted that they have recovered the full amount of their participation in the loans for the Schor House project. See Tr. Vol. II at 54-55, Vol. III at 106-07.
 
 
 23
 In its insured closing service letter, USLife agreed to "reimburse [the Banks] for any loss of your settlement funds transmitted by you to [our issuing agent] where loss results from their fraud or dishonesty." R.1, Ex. A at 1. The district court made an oral ruling that there was no ambiguity in the term "settlement funds"--"actual settlement funds transmitted [by the Banks to the title company]." Tr. Vol. V at 33; see R.77 at 4. Therefore, the district court held that "the coverage against the loss of those funds does not include damages sustained by the payment of attorney's fees, expenses incurred in connection with bringing the loan to closing, or indirect losses, such as a loss of profits." R.77 at 4. Accordingly, the district court concluded that the Banks were entitled to recover from USLife only loss, due to fraud or dishonesty on the part of Bluegrass, of those funds which had been advanced to Bluegrass. The Banks had recouped these funds. Therefore, there was no loss of settlement funds, and no recovery could be obtained against USLife for such incidentals as attorneys' fees, lost profits and miscellaneous expenses.
 
 2. Discussion
 
 24
 As we consider these substantive issues, we are mindful that this case is before us for review of a judgment n.o.v. In diversity actions such as this one, "state law governs disposition of a motion for judgment notwithstanding the verdict." F.W. Hempel & Co. v. Metal World, Inc., 721 F.2d 610, 613 (7th Cir.1983); see In re Innovative Construction Systems, Inc., 793 F.2d 875, 880-81 (7th Cir.1986). Thus, in this case, we must apply Illinois law. According to Illinois law, a judgment n.o.v. should be granted "only when the evidence is so overwhelmingly in favor of the movant 'that no contrary verdict based on that evidence could ever stand.' " Cook v. Hoppin, 783 F.2d 684, 694 (7th Cir.1986) (quoting Pedrick v. Peoria & Eastern R.R. Co., 37 Ill.2d 494, 510, 229 N.E.2d 504, 514 (1967)). Applying this standard to the facts in the record, we agree with the district court that "the evidence totally failed to establish that the Plaintiffs had suffered any loss of settlement funds." R.77 at 3-4.
 
 
 25
 Under the law of Illinois, the question of whether there is an ambiguity in the alleged contract term "settlement fund" was a question of law for the determination of the trial court. Sunstream Jet Express, Inc. v. International Air Serv. Co., 734 F.2d 1258, 1266 (7th Cir.1984); Pioneer Trust & Savings Bank v. Lucky Stores, Inc., 91 Ill.App.3d 573, 575, 47 Ill.Dec. 36, 38, 414 N.E.2d 1152, 1154 (1980); see 12A Ill. L. & Prac. Contracts Sec. 231 (1983). Absent ambiguity, the interpretation or construction of the term was also a question of law for the trial court. Fields v. Franklin Life Ins. Co., 115 Ill.App.3d 954, 958, 71 Ill.Dec. 776, 778, 451 N.E.2d 930, 932 (1983); Marvin N. Benn & Assoc. Ltd. v. Nelsen Steel & Wire, Inc., 107 Ill.App.3d 442, 446, 63 Ill.Dec. 251, 254, 437 N.E.2d 900, 903 (1982). We believe that the district court was correct in determining that the term was not ambiguous and that it referred only to those funds actually transmitted by the Banks to the title company.
 
 
 26
 We also believe that the district court properly rejected the Banks' argument that, even under the court's definition of "settlement funds," they sustained such a loss. The Banks have admitted that they have recovered the full amount of their participation in the loans for the Schor House project. See Tr. Vol. II at 54-55, Vol. III at 106-07. However, they claim that, upon recoupment, they allocated the monies first, to cover the expenses incurred in connection with issuance of the bonds and second, to offset the advance of principal. They maintain that the difference between the amount advanced and the amount of bond proceeds applied to offset the principal constitutes a shortfall in settlement funds, which USLife had insured. The Banks argue that they had the right to allocate the proceeds as they deemed appropriate as long as the allocation was reasonable and that, in any event, equity should dictate that they be reimbursed for the expenses they incurred in connection with the bond sale.
 
 
 27
 We believe that the district court correctly determined that, under Illinois law, the Banks were not empowered to make such an allocation. Indeed, were the Banks allowed to do so, it would constitute, in effect, a circumvention of the court's basic ruling that the term "settlement funds" referred only to those funds actually transmitted to the title company.
 
 
 28
 In making its determination that "settlement funds" could not, through the Banks' accounting theory, include such incidental expenses, the district court found some guidance in Alexander Lumber Co. v. Aetna Accident & Liability Co., 296 Ill. 500, 129 N.E. 871 (1921). In Alexander, the plaintiff entered into a contract with a general contractor for construction of a building. Aetna was the surety on the performance bond. Alexander was paid for materials used in the construction but it applied the payment to an unrelated antecedent debt of the contractor rather than to the receivables account for materials used in the current construction. The plaintiff contended that it was entitled to apply the payment as it deemed appropriate and noted that the contractor had not indicated to which account the monies should be applied. The Supreme Court of Illinois disagreed. It held that the plaintiff must allocate the payment to the contract in question. 129 N.E. at 873. According to the court, to do otherwise "would work an injustice." Id. To allow the plaintiff to allocate the funds as it deemed fit:
 
 
 29
 would be to place in its hands the power to collect its poor accounts with the contractor from funds paid on this contract, and then compel the surety to pay for the material used in the construction of the building under the contract. Such a rule and such a contention is so inequitable and unfair as to shock the conscience of all fair-minded persons. The fair construction of this provision of the bond is that the surety thereon has a right to have payments to the material-man from funds derived from the building covered by the surety contract applied to the account for materials furnished for said building.
 
 
 30
 Id.
 
 
 31
 This case is factually different from Alexander. Yet, the basic principle enunciated there is controlling here. As a general rule, a creditor who holds various accounts of the debtor may, in the absence of direction from the debtor, apply funds to the best advantage of the creditor. However, "[i]t is also the law in Illinois that the general rules regarding the appropriation of payments will not be applied when, from the circumstances surrounding the case, it appears that the application of such rules would work an injustice." Village of Winfield v. Reliance Ins. Co., 64 Ill.App.2d 253, 258, 212 N.E.2d 10, 12 (1965). Indeed, this principle of Alexander is especially compelling here because there simply was no account other than that of the funds that had been transmitted to Bluegrass to which any funds could be applied. The record establishes that, after the Banks realized that there had been no arrangement made for long term financing of the Schor House project, they bargained for an assignment of the mortgage from Isaac and Assoc. to the Banks. In return, the Banks, inter alia, executed a release as to Samuel Isaac, individually, and Isaac and Assoc. according to which they agreed to release all claims against Mr. Isaac and Isaac and Assoc. Also, the Banks signed a covenant not to sue as to Bluegrass. Once the Banks had the mortgage, they arranged for permanent financing, and, while the details are not revealed in the record or by the parties, they were able to thereby recover funds in an amount equal to the funds extended by the Banks for construction financing ($4 million) plus interest.
 
 
 32
 Therefore, when the Banks recovered the amount of the loan plus interest, there was only one account to which the Banks could allocate the funds--the mortgage account. At that time, all other claims arising from the transactions among the Banks, Bluegrass and Isaac and Assoc. had been settled. Indeed, they had been settled in order to facilitate the refinancing of the original loan. Therefore, there could be no "other" account covering attorneys' fees, lost interest and expenses, to which an allocation of funds recovered from the permanent financing arrangement could be made. To allow the allocation of recovered funds as the Banks have argued would, in the words of the Alexander court, "work an injustice." 129 N.E. at 873.
 
 
 33
 Thus, in this case, the Banks could not allocate the proceeds of the bond sale to cover losses different from those that USLife agreed to insure. It would be inequitable to require USLife to "pick up the tab" for an expense against which it did not insure. Rather, they may be held liable only for the risk that they insured--loss of the settlement funds. Because the settlement funds were recovered in full, the Banks are not entitled to any recovery from USLife. Accordingly, we affirm the district court's entry of judgment n.o.v. in favor of USLife.[1]B. Summary Judgment on the Fraud Claim
 
 
 34
 We also believe that the district court was correct in granting summary judgment in favor of USLife with respect to the Banks' fraud claim (count III).
 
 
 35
 The Banks' claim on appeal is that the district court erred in determining that the Banks' fraud claim accrued on or before October 13, 1977, the date the Banks made their first advance on the loan.[2] According to the district court, the claim, which was not filed until December 6, 1982, was barred by Illinois' five-year statute of limitations. See Ill.Ann.Stat. ch. 110, p 13-205. The Banks argue that there were continued fraudulent acts extending from November 1, 1977 until January 1979 (the date of the last advance for the loan). Therefore, they claim that the statute of limitations period did not begin to run until the date of the last injury--in this case, January 1979. Alternatively, they argue that each advance was a separate fraud and that all such advances within five years of the filing date were timely.
 
 
 36
 In our view, the district court properly determined that the Banks' cause of action accrued on October 13, 1977, the date the Banks made their first advance on the loan. The district court noted, R.30 at 17, and the record establishes, that all relevant financing fees--including the one which should have been made to GNMA--were paid in the October 13, 1977 payment. Moreover, the plaintiffs never pleaded continuing fraud. Thus, it is clear that the limitations period began to run on that date. There is no showing of a continuing tort--or of separate frauds. Accordingly, we affirm the summary judgment of the district court with respect to the fraud claim.
 
 
 37
 Accordingly, the judgment of the district court is affirmed.
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 The Banks have appealed from the district court's grant of judgment notwithstanding the verdict (judgment n.o.v.) with respect to the question whether the Banks had accepted USLife's insured closing service letter. Because we decide that, whether or not there was an acceptance, the funds could not be allocated to expenses relating to the bond sale, we need not reach this issue
 Similarly, because we decide that the district court correctly granted judgment n.o.v. in this case, we need not reach the issue whether Plaintiffs' Instruction No. 25 was properly given to the jury.
 
 
 [2]
 At trial--but not on appeal--the Banks also argued that, even if the alleged fraud had been completed on October 13, 1977, the statute of limitations was tolled until February 1, 1979 when they became aware of their cause of action. The district judge ruled, on the authority of Anderson v. Wagner, 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560 (1979) that the original limitations period was not tolled because the Banks had a reasonable time to file their suit after discovery of their cause of action but before the five-year period expired. Because this issue was not raised on appeal, we need not address it