Leonard Leigh Finz, J.
The issue raised in this medical malpractice action is whether subdivision 8 of section 148-a of the Judiciary Law (hereinafter referred to as the "new law”) signed into law on July 1, 1975 is violative of the Constitution. A determination of this question requires a brief review of the facts:
The plaintiff Marcia Halpern was a patient of the defendant doctor for 10 years, during which period the defendant, an *754 obstetrician-gynecologist, delivered all four of the plaintiffs children. He also attended to the plaintiff at regular intervals for routine physical examinations. Concerning the instant matter, the plaintiff complained of a swelling of her right breast. The defendant having noted the enlargement prescribed a diuretic, ascribing the condition to a post-ovulatory swelling. Over the next few months, despite the plaintiffs protestations and concerns over her condition which was worsening, the defendant continued the original treatment, dismissing the possibility of a tumor. More than three months after the original examination, it was definitively diagnosed as a cancerous growth. During the next 18 months the plaintiff underwent two radical mastectomies, an ovariectomy, a series of hospitalizations, massive cobalt treatments and debilitating chemotherapy as a consequence of the metastasis or spread of the cancerous cells. The prognosis of this 37-year-old victim of cancer is regarded as extremely grave.
An action in medical malpractice was brought by both husband and wife as plaintiffs, charging that the defendant departed from accepted medical practices in failing to make a proper diagnosis at the outset and for the grave effects of the disease which it was claimed could have been avoided with early detection and timely treatment.
Thereafter, this matter was presented to a medical malpractice panel in December of 1975, in accordance with the newly enacted legislation effective July 1, 1975. The panel, after a review of the facts presented by both sides, agreed unanimously to a finding of liability. Efforts to dispose of the action by settlement were futile and the matter was advanced for trial to the first day of the January, 1976 term because of plaintiffs grave condition.
During the trial the plaintiff offered the unanimous written recommendation of the medical malpractice panel into evidence. The defendant raised an objection which this court overruled. After a two-week trial the jury returned a total verdict of $175,000 in favor of the plaintiffs. At the trial’s conclusion, the defendant moved to set the verdict aside, raising a constitutional challenge to the new law. In denying the motion, this court did state that it would more fully submit an opinion in support of its denial, it appearing that this was the first case to proceed to conclusion in which the new section set forth earlier was employed. Hence, the following, which will be made part of the record of this action.
*755 Subdivision 8 of section 148-a of the Judiciary Law, effective July 1, 1975, reads as follows:
"If the three members of the panel concur as to the question of liability, a formal written recommendation concerning such question of liability shall be signed by the panel members and forwarded to all parties. In such event, the recommendation shall be admissible in evidence at any subsequent trial upon the request of any party to the action. The recommendation shall not be binding upon the jury or, in a case tried without a jury, upon the trial court, but shall be accorded such weight as the jury or the trial court chooses to ascribe to it.
"If the recommendation is read to the jury or by the trial court, the doctor member or the attorney member of the panel, or both of them, may be called as a witness by any party with reference to the recommendation of the panel only. The party calling such witness or witnesses shall pay their reasonable fees and expenses.”
The second paragraph of the subdivision is not initially relevant here, since neither party saw fit to call either of the permitted members of the panel. It bears, however, on the central question of constitutionality as will be seen further in this analysis.
Testing the constitutionality of any given law is difficult and imposes the burden upon the trial court of determining whether certain fundamental constitutional rights are violated. In addressing this issue, an exploration into the precedents which evoked this statute becomes necessary.
At the time the new law was enacted, the citizens of the State of New York were confronted with a serious problem which threatened the very health and well-being of the total community. It appeared that the cost of malpractice insurance to physicians had soared to a point where physicians talked openly of leaving the State in order to avoid prohibitive insurance premiums. Other physicians actually went on strike, refusing to furnish medical care except in extreme emergency, thereby placing the people of the State in great peril. An additional burden was imposed upon the public, since fees which doctors charged their patients were reflective ostensibly of their increased costs. Not only , did this have its effect on depleting resources of individual middle-income citizens who were already suffering from skyrocketing medical costs, but so too, upon government, since a great number of *756 indigents come within the protection and care of Federal, State and city agencies. In enacting the changes affecting medical malpractice (of which the new law is but a part) the Legislature enunciated the purpose of its bill, which was "to deal comprehensively with the critical threat to the health and welfare of the State as a result of the lack of adequate medical malpractice insurance coverage at reasonable rates.” (Memorandum of State Executive Dept, NY Legis Ann, 1975, p 419.) As a part of the "medical malpractice package”, there was established a medical malpractice insurance association to provide coverage for physicians at a more moderate rate than that threatened by private insurance companies. In addition, the bill authorized the Administrative Board of the Judicial Conference to promulgate rules and procedures necessary for the prompt disposition of medical malpractice actions. Many reports and studies were submitted to the Legislature to assist it in its consideration of this matter, pointing to the crisis situation and ominous atmosphere which impelled special consideration of this vital societal problem. So, too, did the Governor of the State of New York, upon the signing of this legislation into law, repeat almost in haec verba the above-quoted pronouncement of the Legislature — further proof of the concern that spearheaded the new law.
It came as no surprise. The Legislature had concluded that necessity and the public interest mandated action in this critical period. That some method to reduce the cost of medical malpractice insurance had to be found. That some procedure to expedite the disposition of malpractice cases at an incipient stage, thereby reducing the threat of run-away verdicts with their self-defeating sequelae, had to be employed. It was this latter purpose that mandated the creation of the medical malpractice panel, to the effect that qualified persons could sit together with all counsel in a serious attempt to discover if there was a reasonable basis for the action and if there was a mutual attitude toward amicable adjustment. Following a crash and intensive study, the Legislature conceived the formula. A unanimous recommendation among the panel members as to liability or lack of it could be admissible in evidence. This departure from the hitherto established rules would vastly encourage the one'side or the other to an early disposition of the case, it was urged, thereby removing the vagaries of a jury trial with its uncertain and often times alarming verdicts. This was to be a benefit so great that some *757 invasion of established concepts could be permissible, thereby opening the way for the panel’s unanimous recommendation to reach the eyes and ears of jurors who would sit in ultimate judgment on the sensitive issues involved.
Perhaps this situation can find its parallel in the recent decision of the Court of Appeals in Montgomery v Daniels (38 NY2d 41), holding the so-called "no-fault insurance law” to be constitutional.
In discussing the substantive right of the victim of an accident, the Court of Appeals stated (p 53): "We conclude that the partial abolition here of an accident victim’s right to sue for damages caused by another’s negligent action does not deprive the victim of a right or interest protected by the due process clause of either our State or the Federal constitution.”
In discussing the necessity of a statute, the court continued (p 54): "In West Coast Hotel Co. v Parrish (300 US 379, 391) the United States Supreme Court stated that 'regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process’. Thus where a statute is challenged on nonprocedural grounds as violative of due process of law we have consistently asked the question whether there is ' " 'some fair, just and reasonable connection’ between it and the promotion of the health, comfort, safety and welfare of society” ’. (Nettleton Co. v Diamond, 27 NY2d 182, 193, app dsmd sub nom. Reptile Prods. Assn. v Diamond, 401 US 969; People v Pagnotta, 25 NY2d 333, 337, People v Bunis, 9 NY2d 1, 4; Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 541.) In approaching this question, the court has recognized that as a matter of substantive law every legislative enactment is deemed to be constitutional until its challengers have satisfied the court to the contrary (People v Broadie, 37 NY2d 100, 117; People v Pagnotta, supra; Matter of Van Berkel v Power, 16 NY2d 37, 40; I. L. F. Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269, app dsmd 369 US 795). 'There is generally a very strong presumption that "the Legislature has investigated and found the existence of a situation showing or indicating the need for or desirability of the legislation” ’ (Matter of Taylor v Sise, 33 NY2d 357, 364, quoting Matter of Van Berkel v Power, supra; and see People v Broadie, supra). ”
In. discussing the reasonability of the statute, the State’s highest court stated (p 71, Fuchsberg J. concurring):
"What we are dealing with here is not directly the funda *758 mental right to be secure in one’s person or health but rather the economic and social one to recover civil damages when these have been invaded. Therefore, the Legislature is free to experiment and to innovate and to do so at will, or even 'at the whim’ (Munn v Illinois, 94 US 113, 134; North Dakota Pharmacy Bd. v Snyder’s Stores, 416 US 156), so long as it has any reasonable basis for its enactment. (McGowan v Maryland, 366 US 420, 426.) 'Rough accommodations — illogical it may be, and unscientific’ are also permissible. (Metropolis Theater Co. v Chicago, 228 US 61, 69-70.) And 'to find fault with a law is not to demonstrate its invalidity’. (Ibid.) Above all, 'every possible presumption is in favor of its validity and * * * it may not be annulled unless palpably in excess of legislative power’. (Nebbia v New York, 291 US 502, 538.)
"The rational basis test is indeed undemanding. Under it, legislation must be upheld as constitutional 'if any state of facts reasonably may be conceived to justify it.’ (McGowan v Maryland, supra, at p 426, citing Kotch v Pilot Comm., supra, at p 552.).”
Applying the soundness, logic and thrust of Montgomery, the conclusion to be reached here becomes inescapable. Firstly, the substantive right of the parties in a medical malpractice case is not removed by the new statute, since it does not deprive the litigant of a "right or interest protected by the due process clause of either our State or the Federal Constitution” (p 53). Secondly, the necessity for the new law is clearly established in that there is "some fair, just and reasonable connection between it and the promotion of the health, comfort, safety and welfare of society” (p 54). Thirdly, the Legislature is free to experiment and to innovate — so long as it has any reasonable basis for its enactment.
We now proceed to consider specifically whether subdivision 8 of section 148-a, of the Judiciary Law invades the jury province contrary to constitutional mandates.
On this issue, the Legislature attempted an even-handed approach by permitting either side to call as a witness "the doctor member or the attorney member of the panel, or both of them” where the recommendation is admitted into evidence. In this manner, the "attacking” party could attempt to neutralize the impact of the recommendation by demonstrating that the panel hearing was neither as detailed, incisive, nor far-reaching as the jury trial itself. That as such the *759 recommendation should be accorded little or no weight whatsoever.
This opportunity offered by the new law to examine and cross-examine into the genesis of the panel’s finding would appear to give to the jury an even further overview of the case, should the panelists be called as witnesses, than they would otherwisé have had.
But one asks: Despite all of the opportunities for examination and exploration of the recommendation, can it be said realistically that a jury could render a verdict inconsistent with the panel’s findings? Or stated conversely: Would not the impact of the recommendation be so overpowering as to remove de facto the essential elements of fairness and open-mindedness which are so crucial to the total fabric of our jury system, thereby infecting it with prejudicial taint? The response to both questions remains the same. For if the trial court instructs the jury with clarity and simplicity, their true roles as the exclusive finders of fact will prevail. That "the recommendation shall not be binding upon the jury * * * but shall be accorded such weight as the jury * * * chooses to ascribe to it”. With the proper instructions by the court, there could be no constitutional infirmity to contaminate the purity of the jurors’ prerogatives.
Historically, jurors for the most part have proven their independence. They guard their roles with a unique jealousy. They accept with obvious pride the admonitions of the trial court that they are the "sole judges of the facts”. They show their independence and resentment when the "province that is theirs” is threatened by suggestion, device or artifice. While they sit in judgment of their peers, they rise to heights of great importance during this brief period of their civic lives— a posture brought about by the major determinations they are asked to make and by the continuous deference and solicitous manner of the advocates who seek their favor. It is in this backdrop of the total trial where the real challenge of the new law must stand up to review and not in a vacuum, isolated from the other components of evidence, the whole of which comprise the entire compound to be considered. In this regard, it becomes evident that the new law, if carefully pursued and thoughtfully articulated does not represent an incursion upon constitutional guarantees, but rather, reflects the proper extension of legislative prerogatives.
The finding of unconstitutionality should not be lightly *760 undertaken by courts of the first instance. "A statute should not ordinarily be set aside as unconstitutional by court of original jurisdiction unless such conclusion is inescapable. Courts of first instance should not exercise transcendent power of declaring an act of the Legislature unconstitutional except in rare cases involving life and liberty, and where the invalidity of the act is apparent on its face.” (See cases cited, McKinney’s Cons Laws of NY, Book 1, Statutes, § 150, pp 312-313.)
A more cogent direction is contained in the above reference: "If there is any doubt as to the constitutionality of a statute the Legislature’s expressed will should be upheld; and mere doubt does not afford a sufficient ground for a judicial declaration of invalidity. As otherwise expressed, if there is a reasonable doubt as to its validity an act must be upheld, and it will be stricken down only when unconstitutionality is shown beyond a reasonable doubt” (Statutes, supra, p 311; emphasis supplied) — a burden which has not been met here.
In this regard, it has been stated that: "If any state of facts, known or to be assumed, justify the law, the court’s power of inquiry ends and questions as to wisdom, need or appropriateness are for the Legislature (Defiance Milk Prods. Co. v Du Mond, 309 NY 537).” (Matter of Finkel, Nadler & Goldstein v Levine, 46 AD2d 196, 197.)
Experience teaches that necessity is the prime mover of change. Such change, however, must be confined to the discipline and strictures of reasonability. Reasonability is calibrated by standards of acceptable conduct. The application of reason, therefore, mandates the conclusion that necessity was indeed the forerunner of the new law in this instance. That the safeguards recited therein were reasonable and acceptable standards of legislative conduct to the end that the unanimous recommendation of the panel was properly admitted under an existing rule of law. As Justice Benjamin Cardozo, in his writing, "The Nature of the Judicial Process”, so eloquently stated: "The rule that fits the case may be supplied by the constitution or by statute. If that is so, the judge looks no farther. The correspondence ascertained, his duty is to obey. The Constitution overrides a statute, but a statute, if consistent with the Constitution, overrides the law of judges.”
This court, therefore, concludes that subdivision 8 of section 148-a of the Judiciary Law is indeed consistent with the *761 Constitution and accordingly, the court’s "duty is to obey” its mandate. No person should expect or receive less.