**Sheri I. HOEM, Plaintiff,**

v.

**The STATE of Wyoming and The University of Wyoming, acting By and Through The University of Wyoming Student Health Service; T.E. Cronkleton, M.D.; Bertrand N. Honea, M.D.; and Does I–X, inclusive; The Attorney General of the State of Wyoming, or his designee, in his capacity as Director of the Wyoming Medical Review Panel and the Wyoming Medical Review Panel, Defendants.**

No. 87–41.

Supreme Court of Wyoming.

June 14, 1988.

John B. "Jack" Speight, Blair J. Trautwein and Michael Rosenthal of Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, for plaintiff.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., and Karen A. Byrne, Asst. Atty. Gen., for State of Wyo., Atty. Gen. of State of Wyo., or his designee, in his capacity as Director of Wyoming Medical Review Panel and Wyoming Medical Review Panel, defendants.

Nicholas G. Kalokathis of Lathrop & Uchner, P.C., Cheyenne, for University of Wyoming, acting by and through the University of Wyoming Student Health Service and T.E. Cronkleton, M.D., defendants.

W.W. Reeves and M. Greg Carlson of Reeves & Murdock, Casper, for Bertrand N. Honea, M.D., defendant.

Robert W. Tiedeken of Terry W. Mackey, P.C., Cheyenne, for Wyoming Trial Lawyers Ass'n, amicus curiae.

John E. Stanfield of Smith, Stanfield & Scott, Laramie, for Ass'n of Trial Lawyers of America, amicus curiae.

Richard Rideout of Freudenthal, Salzburg, Bonds & Rideout, P.C., Cheyenne, for Wyoming Medical Soc., Inc., Wyoming Hosp. Ass'n, Inc., Wyoming Health Care Ass'n and Wyoming Dental Ass'n, amici curiae.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

This Court is asked to determine the constitutionality of the Wyoming Medical Review Panel Act, § 9–2–1501 et seq., W.S. 1977. We hold that the act is unconstitutional because it violates the equal protection clause of the state constitution.

The act was passed in 1986 for the following purpose:

"[T]o prevent where possible the filing in court of actions against health care providers and their employees for professional liability in situations where the facts do not permit at least a reasonable inference of malpractice and to make possible the fair and equitable disposition of such claims against health care providers as are, or reasonably may be, well founded." Section 9–2–1502, W.S.1977.

The act creates the Wyoming medical review panel and provides that the attorney general or his designee shall serve as di-

rector of the panel and shall promulgate rules and regulations to implement the act. Section 9–2–1505, W.S.1977. The act also provides that the panel shall consist of two health care providers, two lawyers, and one lay person. Section 9–2–1508, W.S.1977. The panel is authorized to review all medical malpractice claims against health care providers. No complaint alleging medical malpractice can be filed in court unless a claim has been filed with the panel and a decision has been rendered. Section 9–2–1506, W.S.1977. Under the act, claimants are required to submit a claim setting forth

"[a] statement in reasonable detail of the elements of the health care provider's conduct which are believed to constitute a malpractice claim, the dates the conduct occurred, and the names and addresses of all physicians, dentists and hospitals having contact with the claimant relevant to the claim and all witnesses[.]" Section 9–2–1507(a)(i), W.S.1977.

The claim also must include a statement signed by the claimant authorizing the panel to have access to all medical, dental, and hospital records pertaining to the claim. The act requires the health care provider to answer the claim within 30 days and to submit a statement authorizing the panel to inspect all medical records pertaining to the claim. A hearing must be held within 120 days after the director receives a claim unless the director or the panel finds good cause for delaying the hearing. Section 9–2–1509, W.S.1977. The hearing is informal, and neither the Wyoming Rules of Evidence nor the Wyoming Administrative Procedure Act applies. The panel must determine whether there is

"(i) [s]ubstantial evidence that the acts complained of occurred and that they constitute malpractice; and

"(ii) [a] reasonable probability that the patient was injured as a result of the acts complained of." Section 9–2–1510(a), W.S.1977.

Panel deliberations are confidential, and any records kept are to be used solely for compiling statistical data and facilitating ongoing studies of medical malpractice in Wyoming. Sections 9–2–1510 and 9–2–1511, W.S.1977. The panel's decision is not subject to review in court, it is not binding on either party, and it is not admissible at trial. Sections 9–2–1509, 9–2–1510, and 9–2–1511.

Plaintiff sets forth the following constitutional challenges to the act:

"1. Does the Wyoming Medical Review Panel Act deny 'equal protection' and, as such, violate Article 1, Section 2; Article 1, Section 3; Article 1, Section 6; Article 1, Section 7; Article 1, Section 34 and Article 3, Section 27 of the Wyoming Constitution and the Fourteenth Amendment of the United States Constitution?

"2. Does the Wyoming Medical Review Panel Act unconstitutionally infringe upon the constitutional and inherent power of the Wyoming Supreme Court, in violation of Article 5, Section 2 of the Wyoming Constitution?

"3. Does the Wyoming Medical Review Panel Act unconstitutionally impede free access to courts, in violation of Article 1, Section 6; Article 1, Section 8; Article 1, Section 9 and Article 10, Section 4 of the Wyoming Constitution and the Fourteenth Amendment to the United States Constitution?

"4. Does the required confidentiality of the Panel proceedings and decision violate the First and Fourteenth Amendments to the Constitution of the United States of America and Article 1, Section 6; Article 1, Section 8 and Article 1, Section 20 of the Wyoming Constitution?"

Because our holding as to plaintiff's equal protection claim is dispositive of this appeal, we decline to address the remaining issues set forth by plaintiff. The following constitutional provisions are relevant to plaintiff's equal protection challenge:

Article 1, § 2 of the Wyoming Constitution.

"In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal."

Article 1, § 3 of the Wyoming Constitution.

"Since equality and the enjoyment of natural and civil rights is only made sure

through political equality, the laws of this state affecting the political rights and privileges of its citizens shall be without distinction of race, color, sex, or any circumstance or condition whatsoever other than individual incompetency, or unworthiness duly ascertained by a court of competent jurisdiction."

Article 1, § 6 of the Wyoming Constitution.

"No person shall be deprived of life, liberty or property without due process of law."

Article 1, § 7 of the Wyoming Constitution.

"Absolute, arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

Article 1, § 8 of the Wyoming Constitution, in pertinent part.

"All courts shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay."

Article 1, § 34 of the Wyoming Constitution.

"All laws of a general nature shall have a uniform operation."

Article 3, § 27 of the Wyoming Constitution, in pertinent part.

"The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say: * * * for limitation of civil actions * * *."

Relying upon these provisions, plaintiff claims that the act violates her equal protection rights in that, on the one hand, it singles out a limited class of health care providers for special protection while, on the other hand, it places an added burden on persons injured by health care providers. Plaintiff argues that the act treats medical malpractice victims differently than those injured by the tortious conduct of someone other than a health care provider in that only medical malpractice victims are prohibited from filing a claim for personal injury directly in court. Plaintiff argues that such a classification is arbitrary, unreasonable, and unrelated to the purpose for which the act was passed.

When considering constitutional claims, this Court has applied the following standards:

"It is clear, according to the stance previously adopted by this court, that there must be some difference which furnishes a reasonable basis for different legislation as to different classes, and the differences must not be arbitrary and without just relation to the subject of the legislation. One who assails a classification must carry the burden of showing that it does not rest on a reasonable basis, but is essentially arbitrary." *Mountain Fuel Supply Company v. Emerson*, Wyo., 578 P.2d 1351, 1354–55 (1978) (citations omitted).

"[C]ourts * * * have proceeded upon the assumption that members of the legislature will investigate and determine for themselves whether or not a proposed law will violate the constitution, and accordingly, have adopted the rule that no law will be declared unconstitutional unless it is clearly so." *Bell v. Gray*, Wyo., 377 P.2d 924, 925–26 (1963).

"If any state of facts can be reasonably conceived which sustain[s] the classification, such facts will be assumed." *Mountain Fuel Supply Company v. Emerson*, 578 P.2d at 1355.

"Although we have a duty to give great deference to legislative pronouncements and to uphold their constitutionality where possible, *it is equally imperative that we declare them invalid when they transgress the Wyoming Constitution.*" *Brenner v. City of Casper*, Wyo., 723 P.2d 558, 560 (1986) (emphasis added).

Applying these standards to the present case, we look first to the state interest intended to be furthered by the act. As demonstrated above, the act was intended to prevent the filing in court of claims against certain health care providers where the facts do not permit a reasonable inference of malpractice and to make possible the fair and equitable disposition of well-founded claims against health care providers. In attempting to reduce the number of claims filed in court against health care providers, the legislature was responding

to the perceived medical malpractice insurance "crisis." The hope was that, by reducing the number of medical malpractice lawsuits, insurance rates would drop and coverage would become more available and affordable.

Before proceeding further with our inquiry, we note the absence in the record of any evidence demonstrating the existence of such a crisis in Wyoming or elsewhere. More importantly, we note the absence in the record of any evidence that the "crisis," if in fact it exists, is in any way connected with medical malpractice claims. The statement of purpose contained in the act offers no explanation as to why the legislature's sole response to the insurance "crisis" was to attempt to change commonly recognized procedures and principles related to causes of action in tort. The act is silent as to other conceivable causes of the "crisis" such as poor management, bad underwriting, and bad investments by the insurance industry. Likewise, the act is silent as to other conceivable approaches to solving the alleged crisis such as regulation of the insurance industry. Apparently, tort reform was the only avenue explored by the legislature in its efforts to solve the "crisis." While it is true that "[t]he social wisdom of the legislature's policy choices is, of course, irrelevant to the question of constitutionality of the Act," it also is true that "[c]omplete disregard for other potential policy options is, however, of at least tangential relevance when considering whether a legislative * * * goal is a legitimate one." *Waggoner v. Gibson*, 647 F.Supp. 1102, 1104 n. 3 (N.D.Tex.1986).

Assuming, however, for the purposes of this opinion, that an insurance crisis does exist in Wyoming and that it is related to medical malpractice litigation, we must determine whether the legislation enacted is rationally related to its stated purpose. There is no question that the legislature has a legitimate interest in protecting the health of the citizens of Wyoming as well as the economic and social stability of the state. The question is whether the legislation at issue constitutes a reasonable and effective means of doing so. We maintain that it does not. It cannot seriously be contended that the extension of special benefits to the medical profession and the imposition of an additional hurdle in the path of medical malpractice victims relate to the protection of the public health. To the contrary,

"if the medical profession is less accountable than formerly because of the special treatment it is afforded by [medical review panel] laws, then a relaxation of medical standards may occur with the public as the victim. '[T]o find that the protection and special dispensation given to health delivery tortfeasors by the challenged legislation is in the best interest of public health is illogical to the point of irrationality.'" *Boucher v. Sayeed*, R.I., 459 A.2d 87, 94 (1983) (quoting from *American Bank & Trust Co. v. Community Hospital of Los Gatos–Saratoga, Inc.*, 104 Cal.App.3d 219, 163 Cal.Rptr. 513, 522 (1980)).

We have said previously that "[t]he continued availability and vitality of * * * causes of action [against health care providers] serve an important public policy—the preservation of quality health care for the citizens of this state." *Greenwood v. Wierdsma*, Wyo., 741 P.2d 1079, 1088 (1987). In light of this basic truth, we hold that the legislature's attempt to limit or reduce such causes of action is not rationally related to a legitimate state interest.

Our holding that the act is not rationally related to protection of the public health or economic and social stability of the state would be sufficient alone to find the act unconstitutional. However, we also are persuaded by the principle that:

"[C]onstitutional protections are not suspended in time of even the most legitimate crisis. See *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952) (constitutional provisions exist 'in good and bad times'); cf. *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (since discredited-internment of Japanese descendants during war); *Konigsberg v. State Bar [of California]*, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957) (fear of communism).

Constitutional protections exist for litigants regardless of market conditions for insurance companies and the medical industry; concerns about the latter cannot be allowed to overrun the former at the expense of those * * * injured by acts of malpractice." *Waggoner v. Gibson*, 647 F.Supp. at 1107.

Although the language quoted above concerns the question of the constitutionality of a limit on the amount recoverable by medical malpractice plaintiffs, it is persuasive in the present case. We cannot condone the legislature's use of the law to protect one class of people from financial difficulties while it dilutes the rights under the constitution of another class of people. Every profession confronts financial distress at some time, and that does not justify depriving others of the equal protection guaranteed by the constitution.

In holding as we do that the act denies equal protection of the law in violation of the constitution, we are cognizant that the majority of states have upheld similar provisions. However, we find the following language to be convincing:

"Most state courts give considerable deference to the state legislatures' specific declarations in statutes that such a crisis does exist and that the substantive portions of the statute are intended to alleviate that crisis. A better approach for those courts that have yet to decide the issue would be, however, to take a more skeptical attitude toward the evidence presented by the medical profession and the insurance industry and toward the conclusion reached by the state legislature regarding the existence of a crisis.

"State courts that have swept aside the equal protection argument have seriously shirked their judicial responsibilities. *Proper scrutiny of the constitutional validity of state legislation demands more than a perfunctory deferral to the legislature's conclusions regarding the existence of a health care crisis* in the particular state." Comment, *Constitutional Challenges to Medical Malpractice Review Boards*, 46 Tenn.L. Rev. 607, 645 (1978) (emphasis added and footnote omitted).

With this admonition in mind, we have no choice but to hold that the Medical Review Panel Act is unconstitutional.

THOMAS, J., filed a specially concurring opinion in which URBIGKIT, J., joined.

CARDINE, J., filed a dissenting opinion in which BROWN, C.J., joined.

THOMAS, Justice, specially concurring, with whom URBIGKIT, Justice, joins.

It is fortunate that §§ 1, 2 and 3 of the Constitution of the State of Wyoming did not structure the Supreme Court as a debating society. It surely would have become one of the most grand and glorious of such bodies in all history if it had been permitted that role.

The oath of office with which I am familiar encompasses fidelity to "the constitution of this state." It is that fidelity to the constitution which imparts efficacy to the separation of powers doctrine. I am satisfied that the Wyoming Medical Review Panel Act, §§ 9–2–1501 through 9–2–1511, W.S.1977 (June 1987 Repl.), must be declared unconstitutional. The other members of the majority assign primary significance to Art. 1, § 2 of the Constitution of the State of Wyoming, and justify declaring the statute to be unconstitutional on the ground that it invades the equal protection standard. The conclusion is that there is no rational basis for creating a class consisting of victims of medical malpractice. I do not disagree with that approach, but I also would declare the statute to be unconstitutional under Art. 1, § 8, and Art. 2, § 1 of the Constitution of the State of Wyoming.

In further support of the conclusion that the statutory classification is unconstitutional, *Farley v. Engelken*, Kan., 740 P.2d 1058 (1987), is significant and persuasive. The case addressed a statutory exception to the collateral source rule in favor of medical malpractice actions. In a thoughtful and provacative opinion, the Kansas Supreme Court concluded that a "heightened scrutiny" test should be applied to victims of medical malpractice as a "quasi-

suspect" class. The Wyoming Medical Review Panel Act, in requiring executive department review of claims submitted by victims of medical malpractice before they may file an action in the courts, parallels the Kansas statute creating an exception for the collateral source rule in medical malpractice cases.

The Kansas court concluded that a Kansas citizen has a right, recognized and protected by its constitution, to a remedy for injury to person or property and that such a right justifies invoking the higher level of scrutiny. The "heightened scrutiny" standard, which it applied, eschews a presumption of constitutionality, which must be overcome by one who challenges the statute when the rational basis test is invoked and requires greater justification for the classification. At the other end of the spectrum, the standard also eschews the heavy burden of proof placed on the state to demonstrate a compelling state interest, which the "strict scrutiny" standard requires. Instead, as explained by the Kansas court, the "heightened scrutiny" standard requires "the statutory classification to substantially further a legitimate legislative purpose." In reaching this determination, the "heightened scrutiny" analysis requires that the interests of the burdened class be balanced against those of the benefited class, in the context of the legislative purpose. This standard peculiarly is applicable in an instance such as this, which does not involve any political question of importance to the state but essentially touches upon private interests. Utilization of the "heightened scrutiny" standard in this case seems eminently fair.

Analysis of the Wyoming Medical Review Panel Act in this context leads to the conclusion that, while the burdened class (victims of medical malpractice) are required to wait at least an additional four months, and quite possibly much longer, in order to pursue their claims, the benefited class (the health care providers) really gain no advantage. The Wyoming Medical Review Panel Act serves only as an impediment to pursuing a claim for medical malpractice, providing no recourse to anyone. The ultimate product, which is not binding on any participant, is a decision reached in a proceeding, which is to be held in confidence. The process delays, for a minimum of 120 days, the right of the claimant to file a civil action, and there is no limit upon the period to which the proceeding may be extended for good cause.

It almost seems that the Medical Review Panel Act process becomes an end in itself. Perhaps the real purpose simply was to spend state money to pursue such a review. The five panel members must be paid $40 per hour for the time spent in hearings and the time traveling to the hearings, as well as be reimbursed for their travel and per diem expenses. In lean times, the appropriation of some $200,000 for a process that produces no result certainly is suspect. Legislation that apparently furthers only an academic interest does not serve to accomplish any goal, never mind a legitimate state interest.

I agree that this statute is unconstitutional under even a rational basis test, but it is quite clear that it cannot be sustained under the "heightened scrutiny" test. Setting apart victims of medical malpractice from victims of other tortious conduct as a separate class is patently unrelated to any reasonable or rational state purpose, nor can it be justified by any state of facts that reasonably might be conceived. Of a certainty, there is no legitimate legislative purpose for this classification that would survive the "heightened scrutiny" test.

It may be that some of the events alluded to in the various newspaper articles and other documents in the dissenting opinion actually occurred. I recall arguments to the effect that legislation such as this was necessary in Wyoming to maintain medical services. The argument was, in substance, that medical care providers would cease practicing their profession because of the increasing cost of malpractice insurance. The record, however, does not teach us any of that. The fact of responsible jurisprudence is that the members of this court are called in every case, in accordance with their respective constitutional oaths, which are administered pursuant to Art. 6, § 10 of the Constitution of the State of Wyo-

ming, to review the record before the court to test the constitutionality of any statute, in this instance, the Wyoming Medical Review Panel Act, §§ 9–2–1501 through 9–2–1511, W.S.1977 (June 1987 Repl.). The majority of the court must, under recognized principles, look only to the record to arrive at a decision.

If one were to believe the manifestation of a crisis in this instance, one would have to recognize that the strange bedfellows in this political suite were (1) those who furnished medical care and services, who are seeking to maintain profits by reducing insurance premiums as much as possible, and (2) insurance carriers, who are seeking to maintain profits not necessarily by reducing insurance premiums but, hopefully, by inhibiting any victims of medical malpractice from being compensated out of the reserves funded by those premiums. However this bedfellowship may be described, there can be little question that these groups represent a politically powerful coalition. There is some apparent validity to the argument that it is necessary to maintain a profit posture for insurance carriers so that they will continue to write the coverage. The assumption, which has not necessarily been tested, is that unjust claims are being prosecuted successfully, and this assumption may be a fallacy. There is another assumption that medical care providers, particularly doctors, pursue their profession only because of economic motivations. In my judgment, that assumption is subject to challenge and well may be a fallacy. Even if these assumptions were conceded to be true, there is nothing in the Wyoming Medical Review Panel Act that would inhibit the prosecution of unjust claims or would necessarily reduce the insurance premiums paid by physicians. Fascinating as these arguments may be, they have no relevance to the resolution of the issues posed in this case.

If it be taken as true that the medical practitioners and their insurance carriers orchestrated the events alluded to in the dissenting opinion, they must have been very frustrated because the legislature did not learn the tune, at least not well enough to play it back. While this court is encouraged to rely upon the public debate that occurred in Wyoming, and elsewhere, in order to decide this case, in terms of the record, we need examine only the articulation of the purpose found in § 9–2–1502, W.S.1977 (June 1982 Repl.), which states:

"The purpose of this act is to prevent where possible the filing in court of actions against health care providers and their employees for professional liability in situations where the facts do not permit at least a reasonable inference of malpractice and to make possible the fair and equitable disposition of such claims against health care providers as are, or reasonably may be, well founded."

This statement addresses private interests only. There is not a hint of any public interest to be served. Some say we cannot ignore the furor which claimed to articulate a public interest. If the legislature, however, chose to ignore that drama in its statement of the purpose for the legislation, the court must follow suit. Limiting the justification for the statute to the purpose stated by the legislature, which the record demands we do, it is clear that there is no legitimate legislative purpose nor any valid state interest, which is achieved or furthered by this legislation. It speaks to private interests only.

While I am prepared to agree with the majority's conclusion that the Wyoming Medical Review Panel Act violates Art. 1, § 2 of the Constitution of the State of Wyoming, my focus is upon Art. 1, § 8. It is interesting to compare the language of the articulated legislative purpose with the specific provisions of Art. 1, § 8, which reads:

"All courts shall be open and every person for an injury done to person, reputation or property shall have justice administered *without* sale, denial or *delay.*" (Emphasis added.)

The Supreme Court of Missouri declared a similar legislative scheme unconstitutional pursuant to a substantially identical article of that state's constitution. *State ex rel. Cardinal Glennon Memorial Hospital for Children v. Gaertner*, Mo., 583 S.W.2d 107 (1979). See also *Jiron v. Mah-*

*lab,* 99 N.M. 425, 659 P.2d 311 (1983) (declaring unconstitutional a New Mexico statute providing for a review panel, in light of a similar constitutional provision, as applied to the circumstances of the case); cf., *People ex rel. Christiansen v. Connell,* 2 Ill.2d 332, 118 N.E.2d 262 (1954). The fact that there is no limit upon the duration of the Medical Review Panel Act proceedings is an additional reason to declare it unconstitutional pursuant to Art. 1, § 8 of the Constitution of the State of Wyoming. See *Aldana v. Holub,* Fla., 381 So.2d 231 (1980); *Mattos v. Thompson,* [491] Pa. [385], 421 A.2d 190 (1980). Because this legislation engenders delay in presenting claims in the judicial branch, without accomplishing any legislative purpose or serving any state interest on behalf of Wyoming citizens, I find it unconstitutional under Art. 1, § 8 of the Constitution of the State of Wyoming.

In addition to being invalid under Art. 1, §§ 2 and 8 of the Constitution of the State of Wyoming, I am satisfied that the effort to structure a review of a legal remedy by a panel created within the executive department of government, prior to pursuing the available remedy in the judicial department, runs afoul of Art. 2, § 1 of the Constitution of the State of Wyoming. I also would declare the Medical Review Panel Act unconstitutional under that article. There are times in which the significance of the separation of powers doctrine, found in Art. 2 of the Constitution of the State of Wyoming, is that the judicial branch of government must recognize the interests of the politically powerless and speak for those interests in order to defend the concept of justice. Future victims of potential medical malpractice fit within this principle.

CARDINE, Justice, dissenting, with whom BROWN, Chief Justice, joins.

After reviewing the opinion of the court, the special concurrence and this dissent, I am left with the nagging feeling that if the supreme court is not a debating society, it will surely do until the real thing comes along. Debating society or not, there is not a single thoughtful or provocative opinion nor any scholarly authority that supports holding the Wyoming Medical Review Panel Act unconstitutional. Cases cited by the court to support its holding concern statutes that differ materially from the Wyoming act. Applying correct standards of review and constitutional determination, there cannot be the slightest doubt that the Wyoming Medical Review Panel Act is constitutional.

The opinion of the court acknowledges that the party attacking a statute has the burden of demonstrating its unconstitutionality beyond a reasonable doubt. The party attacking the statute in this case is plaintiff Sheri I. Hoem. The state of Wyoming, represented by the attorney general, does not attack the statute but asserts its constitutionality. The court in its opinion states:

> " 'One who assails a classification must carry the burden of showing that it does not rest on a reasonable basis, but is essentially arbitrary.' *Mountain Fuel Supply Company v. Emerson,* Wyo., 578 P.2d 1351, 1354–55 (1978)."

After acknowledging that the burden is upon the party attacking the constitutionality of the statute (in this case plaintiff), the majority of this court states:

> "[W]e note the absence in the record of any evidence that the 'crisis,' if in fact it exists, is in any way connected with medical malpractice claims. The statement of purpose contained in the act offers no explanation as to why the legislature's sole response to the insurance 'crisis' was to attempt to change commonly recognized procedures and principles related to causes of action in tort. The act is silent as to other conceivable causes of the 'crisis' such as poor management, bad underwriting, and bad investments by the insurance industry. Likewise, the act is silent as to other conceivable approaches to solving the alleged crisis such as regulation of the insurance industry."

If the record is silent upon matters necessary to an attack upon the statute, then appellant should not prevail, for she has failed in her burden of presenting evidence

that will demonstrate unconstitutionality beyond a reasonable doubt. *Bell v. State*, Wyo., 693 P.2d 769 (1985). In *Meyer v. Kendig*, Wyo., 641 P.2d 1235 (1982), we said that in determining the constitutionality of a statute, we were governed by the following standards:

"'Statutes are presumed to be constitutional unless affirmatively shown to be otherwise, and one who would deny the constitutionality of a statute has a heavy burden. The alleged unconstitutionality must be clearly and exactly shown beyond any reasonable doubt. One who assails a classification must carry the burden of showing that it does not rest on a reasonable basis, but is essentially arbitrary, and if any state of facts can be reasonably conceived which sustains the classification, such facts will be assumed.

"'Courts have a duty to uphold the constitutionality of statutes which the legislature has enacted if that is at all possible, and any doubt must be resolved in favor of constitutionality.'" (Citations omitted.) Id. at 1238–39 (quoting *Washakie County School District Number One v. Herschler*, Wyo., 606 P.2d 310, 319 (1980), reh. denied, cert. denied 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980)).

And where a party assailing the constitutionality of a statute asserts that it is violative of equal protection because, in treating different persons differently, the classifications do not bear a rational relationship to a legitimate state objective, we have said:

"'One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.'" *Baskin v. State ex rel. Worker's Compensation Division*, Wyo., 722 P.2d 151, 155 (1986) (quoting *In re Trent's Claim*, 68 Wyo. 146, 231 P.2d 180 (1951), overruled *Bowers v. Wyoming State Treasurer ex rel. Workmen's Compensation Division*, Wyo., 593 P.2d 182 (1979)).

This court cannot lawfully hold this act to be unconstitutional upon a silent record. Nor can the court deny that appellant has failed to satisfy the heavy burden she has to establish unconstitutionality.

Statutes dealing with the medical malpractice crisis have been enacted by more than 26 states. Twenty-three of these states and three federal circuits have rejected equal protection arguments. The following states with statutes that are similar or identical to Wyoming's medical review panel act have held their statutes constitutional. *Reese v. Rankin Fite Memorial Hospital*, Ala., 403 So.2d 158, 160–62 (1981); *Eastin v. Broomfield*, 116 Ariz. 576, 570 P.2d 744, 750–51 (1977); *Gay v. Rabon*, 280 Ark. 5, 652 S.W.2d 836, 837–38 (1983); *Lacy v. Green*, Del.Super., 428 A.2d 1171, 1177–78 (1981); *Pinillos v. Cedars of Lebanon Hospital Corporation*, Fla., 403 So.2d 365, 367–68 (1981); *LePelley v. Grefenson*, 101 Idaho 422, 614 P.2d 962, 967–68 (1980); *Anderson v. Wagner*, 79 Ill.2d 295, 37 Ill.Dec. 558, 402 N.E.2d 560, 570–71, *appeal dismissed* 449 U.S. 807, 101 S.Ct. 54, 66 L.Ed.2d 11 (1979); *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585, 600–01 (1980); *Rudolph v. Iowa Methodist Medical Center*, Iowa, 293 N.W.2d 550, 557–59 (1980); *Stephens v. Snyder Clinic Association*, 230 Kan. 115, 631 P.2d 222, 233–36 (1981); *Everett v. Goldman*, La., 359 So.2d 1256, 1265–67 (1978); *Attorney General v. Johnson*, 282 Md. 274, 385 A.2d 57, 76–80, *appeal dismissed* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed. 2d 97 (1978); *Paro v. Longwood Hospital*, 373 Mass. 645, 369 N.E.2d 985, 987–89 (1977); *Linder v. Smith*, Mont., 629 P.2d 1187, 1192–93 (1981); *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657, 667–69 (1977); *Perna v. Pirozzi*, 92 N.J. 446, 457 A.2d 431, 437, 39 A.L.R.4th 1018 (1983); *Armijo v. Tandysh*, 98 N.M. 181, 646 P.2d 1245, 1247 (1981); *Comiskey v. Arlen*, 55 A.D.2d 304, 390 N.Y.S.2d 122, 129–30 (1976); *Roberts v. Durham County Hospital Corporation*, 56 N.C.App. 533, 289 S.E. 2d 875, 878–80 (1982), aff'd 307 N.C. 465, 298 S.E.2d 384 (1983); *Beatty v. Akron City Hospital*, 67 Ohio St.2d 483, 424 N.E. 2d 586, 591–95 (1981); *Allen v. Intermountain Health Care, Inc.*, Utah, 635 P.2d 30, 31–32 (1981); *Duffy v. King Chiropractic Clinic*, 17 Wash.App. 693, 565 P.2d 435,

437 (1977); *State ex rel. Strykowski v. Wilkie*, 81 Wis.2d 491, 261 N.W.2d 434, 441–44 (1978); *Woods v. Holy Cross Hospital*, 591 F.2d 1164, 1171–75 (5th Cir.1979); *DiAntonio v. Northampton–Accomack Memorial Hospital*, 628 F.2d 287, 291–92 (4th Cir.1980); *Fitz v. Dolyak*, 712 F.2d 330, 332–33 (8th Cir.1983). California, after construing parts of its statute pertaining to periodic payment of future damages, also held its statute constitutional. *American Bank and Trust Company v. Community Hospital of Los Gatos–Saratoga, Inc.*, 36 Cal.3d 359, 204 Cal.Rptr. 671, 683 P.2d 670, 677, 41 A.L.R.4th 233 (1984).

Three states found their legislation to be unconstitutional generally because of provisions not found in the Wyoming act. In *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825, 830–39, 12 A.L.R.4th 1 (1980), the statute was held unconstitutional because it provided for periodic payment, abolished the collateral source rule, and required that witnesses for plaintiff be expert in their field—provisions not found in the Wyoming statute. *Arneson v. Olson*, N.D., 270 N.W.2d 125, 131–36 (1978), held its statute unconstitutional because of provisions precluding joinder of parties and severely limiting the doctrine of res ipsa loquitur—provisions not found in the Wyoming statute. *Boucher v. Sayeed*, R.I., 459 A.2d 87, 93 (1983), held unconstitutional an act that provided, after the filing of a medical malpractice lawsuit, for a preliminary hearing which could result in the dismissal of plaintiff's lawsuit with prejudice—a provision not found in the Wyoming statute. New Mexico applied a strange holding in one case but declined to hold its statute unconstitutional, the dissent stating:

"If the majority feels that the statute is unconstitutional, the appropriate measure would be to say so and allow the Legislature to remedy the problem." *Jiron v. Mahlab*, 99 N.M. 425, 659 P.2d 311, 314 (1983) (Stowers and Riordan, JJ., dissenting).

The challenge to the constitutionality of the medical review panel act is before us in this case because a potential plaintiff structured a case by refusal to appear before the medical review panel. The Wyoming Trial Lawyers Association has filed an amicus brief. They attack this innocuous statute that imposes no perceptible burden on claimants, changes no law, affects no right to sue or recover, nor limits the amount of such recovery. Why they attack this statute, reopen old wounds, perpetuate this controversy and heated exchange with the medical profession and other citizens of this state is difficult to understand. It does seem, however, that if the participants fight hard enough and long enough, eventually they will succeed in causing some legislation to be produced that may drastically change the way persons injured by medical negligence are compensated. A committee of the legislature was meeting at the time this dissent was prepared to consider reforms and revisions in the existing medical review panel act. The matter is of great concern. Thus, on November 4, 1987, a newspaper, with state-wide circulation, in an editorial, stated:

"On July 1, St. Paul Fire and Marine Insurance Co., the major company writing malpractice insurance for Florida doctors, hiked rates 43 percent for doctors in Dade and Broward counties and announced it would stop insuring Florida doctors altogether at the end of 1988.

"More than 1,000 doctors refused to continue working in the counties' emergency rooms * * *." Casper Star Tribune (Nov. 4, 1987).

In the June 5, 1988 Casper Star Tribune, Dr. Saunders of Sheridan, Wyoming, states in a letter to the editor:

"We do not believe that $58,000 a year for professional liability insurance for an obstetrician/gynecologist in this state is reasonable * * *."

"If I raise my rates, fewer people can afford my services and the quality of care will deteriorate because people will forsake prenatal care.

"We could be facing a situation like we were 15–20 years ago, where the perinatal mortality in this state was the highest in the nation! Then there will be victims of the system—more brain damaged babies—more prematures, etc."

To deny a public interest or the existence of a crisis is to be out of touch with reality. Thus it was said that

"[t]he recent medical malpractice crisis is the result of the increasing reluctance of insurance companies to write medical malpractice insurance policies and the dramatic rise in premiums demanded by those companies which continue to issue policies. The difficulties in obtaining insurance at reasonable rates have forced many health care providers to curtail or cease to render their services. Such a situation creates obvious dangers to the public welfare, and many state legislatures have attempted to take remedial action." (Footnote omitted.) Comment, An Analysis of the State Legislative Responses to the Medical Malpractice Crisis, 1975 Duke L.J. 1417 (1975).

"The current crisis in the provision of medical malpractice insurance has reached proportions of such magnitude that few commentators doubt its seriousness. Dramatic increases in medical malpractice insurance rates accompanied by the decreasing availability of malpractice insurance coverage are the most visible aspects of the crisis. Between 1960 and 1970, for example, insurance rates for surgeons rose 949.2 percent; rates for non-surgical physicians increased 540.8 percent; and hospital premiums increased 262.7 percent. The situation has worsened considerably since 1970. Premiums paid by physicians in some states rose more than 100 percent between 1974 and mid–1975 alone. One irony of the situation is that doctors faced with sky-rocketing insurance rates may, in the not-too-distant future, be considered comparatively lucky; many doctors may be unable to obtain any insurance coverage at all." (Footnotes omitted.) Redish, Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications, 55 Texas L.Rev. 759–60 (1977).

Against this background, Wyoming medical doctors traveled to Cheyenne and marched en masse to the state capitol. They testified before committees of the legislature, as did lawyers and other interested citizens. After lengthy debate over an extended period of time and drafting and redrafting of legislation, the legislature overwhelmingly (the House 63 to 1) enacted the "Wyoming Medical Review Panel Act," §§ 9–2–1501 through 9–2–1511, W.S.1977. This court now, without any support in law, incorrectly holds the Wyoming Medical Review Panel Act unconstitutional.

I do not say by this dissent that the act is a good one nor that it accomplishes its intended purpose. But that is not for the court to say. Constitutionality is for the courts, and I am convinced that according to all legal precepts and principles, this act is constitutional. I find nothing in my oath to "support, obey and defend * * * the constitution of this state," and "discharge the duties of my office with fidelity," Art. 6 § 20, Wyoming Constitution, that even suggests that this court declare legislation not to its liking unconstitutional. I do suggest that we recognize established law, honor the doctrine of stare decisis, and be true to our previous pronouncements that statutes are presumed to be constitutional; that unconstitutionality must be clearly and exactly shown beyond any reasonable doubt; that courts have a duty to uphold the constitutionality of statutes; that any doubt must be resolved in favor of constitutionality; that one who assails a statute has the burden of showing unconstitutionality, and in the absence of such showing any state of facts that will sustain the classification will be assumed. *O'Brien v. State*, Wyo., 711 P.2d 1144 (1986); *White v. Fisher*, Wyo., 689 P.2d 102 (1984); *Armijo v. State*, Wyo., 678 P.2d 864 (1984); *Thomson v. Wyoming In–Stream Flow Committee*, Wyo., 651 P.2d 778 (1982); *Weiss v. State ex rel. Cardine*, Wyo., 455 P.2d 904 (1969), *cert. denied* 398 U.S. 927, 90 S.Ct. 1815, 26 L.Ed.2d 89 (1970). Applying these standards and tests, this statute is constitutional.

But one cannot help but conclude from the overall tenor of the court's opinion that it simply does not like the statute adopted by the legislature. The likes or dislikes of individual justices have nothing to do with

constitutionality of laws. Thus, it is said: "In reviewing legislative enactments, the court does not sit to judge the merits or wisdom of the act." *Farley v. Engelken,* 241 Kan. 663, 740 P.2d 1058, 1062 (1987).

" 'Though we may question the wisdom of a given enactment, as a matter of policy, that gives us no right to strike it down, if it violates no provision of the fundamental law.' " *Otero v. Zouhar,* 102 N.M. 493, 697 P.2d 493, 500 (1984) (quoting *Village of Deming v. Hosdreg Company, Inc.,* 62 N.M. 18, 303 P.2d 920 (1956)).

A medical panel review act, similar to Wyoming's act, enacted by the Nebraska legislature was attacked as unconstitutional in *Prendergast v. Nelson,* supra 256 N.W.2d 657. The Nebraska Supreme Court said,

" 'There are substantial reasons for legislative discrimination in regard to this field. We have seen in recent years the growth of malpractice litigation to the point where numerous insurance companies have withdrawn from this field. Insurance rates are practically prohibitive so that many professional people must either remain unprotected or pass the insurance charges along to their patients and clientele in the form of exorbitant fees and charges. This unduly burdens the public which requires professional services.' [Quoting from *Taylor v. Karrer,* 196 Neb. 581, 244 N.W.2d 201 (1976).]

" * * * ' "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality. * * * The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific. * * * A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' * * *

But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." ' [Quoting from *Botsch v. Reisdorff,* 193 Neb. 165, 226 N.W.2d 121 (1975).]

" * * * As we previously indicated, we have no reason to question the need for the legislation, and the defendant has failed to produce any evidence which would indicate otherwise.

*       *       *       *       *       *

"At the time of the enactment of the act in question, there was an imminent danger that a drastic curtailment in the availability of health care services could occur in this state. No one can question the Legislature's power to deal with the problem. We affirm the right of the Legislature to exercise the police power to promote the general health and welfare of the citizens of this state." 256 N.W.2d at 668.

Montana is another of the 23 states that have enacted this kind of legislation. Again the act was attacked as unconstitutional and the court stated:

"The burden is on the party challenging the legislation to show that the facts do not support the legislative enactment. We will presume a statute's validity, unless the constitutional violation is 'clear and palpable.' We conclude here that the claimant did not sustain his burden of proof. Our previous discussion of the findings of the Master and of the evidence presented to the legislature convinces us that the legislature responded to a medical situation in a rational manner. We find that the classifications rest on distinctions between the groups of tort plaintiffs and tort defendants involved which have a fair and rational relationship to the object of the legislation." (Citations omitted.) *Linder v. Smith,* supra, 629 P.2d at 1193.

The court finally in its majority opinion holds that the legislature's attempt to limit or reduce such causes of action is

"not rationally related to protection of the public health or economic and social

stability of the state [and] would be sufficient alone to find the act unconstitutional."

Answering this identical question, the New Mexico Supreme Court stated:

"The answer to the 'rational relationship' argument, which asserts a violation of due process and equal protection, is that there is *nothing in the record* before us indicating an absence of a rational relationship between the legislative purpose and the accomplishment of that purpose." (Emphasis added.) *Otero v. Zouhar,* supra, 697 P.2d at 500.

The court held the New Mexico act constitutional. It is utterly startling that this court in its majority opinion acknowledges that there is *nothing in the record* in this case to demonstrate absence of a rational basis for the classification and yet, without any legal authority, contrary to our prior holdings, finds the enactment of the medical review panel act by the Wyoming legislature unconstitutional.

The specially concurring opinion is premised almost entirely upon a Kansas case, *Farley v. Engelken,* supra 740 P.2d 1058, which is not in point, for it considered not the issue presented to us, but "whether the equal protection clause of the Kansas Constitution is violated by the statutory abrogation of the collateral source rule in medical malpractice actions." Three dissenting Kansas Supreme Court justices thought the opinion of the court was not significant, persuasive, thoughtful or provocative. They thought it was clearly wrong. I agree. Thus, the "heightened scrutiny" test which the special concurrence finds so appealing was applied by the Kansas court after acknowledging that it had "previously applied a 'rational basis' test to uphold the constitutionality of malpractice 'crisis' legislation." Id. at 1065. The attempt by the Kansas court to distinguish the prior cases makes it clear that the "rational basis" is the proper test to be applied in the case before our court. This conclusion is supported by the fact that the rational basis test has been applied in thoughtful, persuasive opinions by the vast majority of courts in the cases heretofore cited in this

dissent which consider the type of medical malpractice statute now before us.

Some medical care providers have ceased practicing their profession because of the increasing cost of medical malpractice insurance. If the insurance premium is $50,000 (not unusual), the doctor must pay it from practicing medicine. The $50,000 must come either from fees charged patients or the doctor's own property. If it cannot come from either place, he will probably quit. Thus, last month KTWO Television reported that doctors have ceased obstetrical practice in Torrington, Lusk, and Douglas, Wyoming because of the cost of insurance.

It is said "[t]here is not a hint of any public interest to be served." I cannot even comprehend such a suggestion in view of all that is before us; and it matters not that the legislature did not make specific reference, for it is implicit in the statute's statement of purpose and was explored in detail in the legislative hearings.

Finally, out of thin air, without citation of authority, it is suggested the act runs afoul of the separation of powers doctrine by creating a panel to hear claims before they are filed in court. There is nothing new or novel about that procedure. Agencies, panels and boards are recognized, necessary, and essential to the business of government. We have never questioned the constitutionality of agencies created by the legislature that hold hearings, take evidence, and decide important controversies between citizens. *Fosters, Inc. v. City of Laramie,* Wyo., 718 P.2d 868 (1986); *Rolfes v. State ex rel. Burt,* Wyo., 464 P.2d 531 (1970); Bloomenthal, Administrative Law in Wyoming—An Introduction and Preliminary Report, 16 Wyo. L.J. 191, 194 (1961). Thus it has been said that

"practical men have been seeking practical answers to immediate problems, and their concern has been with how to get the * * * job done * * *. When the first Congress in 1789 wanted to provide benefits to the veterans of the Revolutionary War, it found high-paid judges and the trappings of a courtroom inappropriate for determining which individuals were

entitled to benefits, and so the first Congress assigned the judicial task to an agency that could use a staff of low-paid clerks. Congress made similar down-to-earth, pragmatic, nontheoretical decisions when it created the Patent Office in 1790, the Office of Indian Affairs in 1796, and the General Land Office in 1812." K. Davis, Administrative Law § 2:1 at 60 (1978).

The legislature has created boards, commissions, administrative agencies, special hearing officers in worker's compensation, and professional licensing boards that all hear and decide claims and controversies that may or may not ultimately reach a court. Examples of some of these boards, panels and agencies are the Employment Security Commission, Parole Board, Parimutuel Commission, Oil and Gas Commission, Livestock Board, Game and Fish Commission, Real Estate Commission, Financial Institution Board, boards of examiners for law, medicine and accounting, and other licensing boards. I cannot understand even a suggestion that the acts creating all of these agencies and boards are unconstitutional as violating the separation of powers doctrine.

The Wyoming Medical Review Panel Act requires a claimant, before filing suit, to file a claim with the board which will be set for hearing within 120 days of receipt of the claim. The hearing is informal before two medical practitioners, two attorneys, and one other person. The stated goal of the Wyoming Medical Review Panel Act is:

a) "to prevent where possible the filing in court of actions against health care providers and their employees for professional liability in situations where the facts do not permit at least a reasonable inference of malpractice,"

and

b) "to make possible the fair and equitable disposition of such claims against health care providers as are, or reasonably may be, well founded." Section 9–2–1502, W.S.1977.

The act provides that:

"(a) Upon consideration of all the relevant material, the panel shall determine whether there is:

"(i) Substantial evidence that the acts complained of occurred and that they constitute malpractice; and

"(ii) A reasonable probability that the patient was injured as a result of the acts complained of." Section 9–2–1510.

The act has a rational basis and is reasonably structured to accomplish its purpose. If the panel, comprised of medical doctors and lawyers, determines that the acts complained of did not constitute malpractice or that they did not cause injury, plaintiff would not likely pursue the claim because these types of claims are exceedingly costly, difficult and complicated. Several expert witnesses are always required. Weeks are consumed in trial. If the panel determined there was probably malpractice, plaintiff would feel more secure in incurring the expense of proceeding. The likelihood of settlement would be enhanced.

The state of Arizona enacted a similar medical review panel act, and in *Eastin v. Broomfield*, supra 570 P.2d at 751, the court stated:

"The panel provision was one of the several provisions enacted by the Arizona legislature in an effort to curb rising medical malpractice insurance premiums. At the time the Act was enacted, there was evidence that medical malpractice insurance costs, as well as hospital professional liability costs, were doubling every three years. (Arizona Medical Malpractice Insurance Study, Booz, Allen Consulting Actuaries, prepared for the Arizona Legislative Council.)

"By providing a system whereby the meritorious claims could be separated from the frivolous ones prior to trial and pretrial settlements would be encouraged, the Act promoted a legitimate legislative purpose. See *Halpern v. Gozan*, 85 Misc.2d 753, 381 N.Y.S.2d 744 (1976).

"We do not believe that the panel provisions violate the equal protection clause because the classification created by the Act has a rational basis."

Under the Wyoming act, a copy of the panel's decision is provided the state licensing board and used by the state for the

purpose of compiling statistical data in facilitating ongoing studies of medical malpractice in the state. There is nothing that requires that legislation be perfect. The legislative process provides for amendment and fine tuning of enactments to serve the needs of society. Thus we have said that " 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' " *Bell v. State,* supra, 693 P.2d at 771 (quoting *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955)). It is appropriate that "[t]o attempt to meet a crisis, the Legislature is free to experiment and to innovate and to do so at will, or even 'at the whim.' *Munn v. Illinois,* 94 U.S. [4 Otto] 113, 24 L.Ed. 77." *Prendergast v. Nelson,* supra, 256 N.W.2d at 668. The legislature will review this act at its next session. It should be free to review the compiled data, hold hearings, and modify the act as necessary to serve the needs of the citizens of this state.

The requirements of the act are easily met. They are not onerous nor do they result in any significant delay nor prejudice to any of the parties. It is too early to tell at this time whether the act accomplishes its stated purposes. Whether it does or not, does not result in its being unconstitutional. Neither does it mean that the legislature, after studying the statistics that will become available, cannot correct any deficiencies, amend the act to alleviate the crisis in other ways, or do anything else that might be in the interest of citizens of this state who must have medical care at reasonable costs. The purpose of the medical panel review act is stated as:

> "The purpose of this act is to prevent where possible the filing in court of actions against health care providers and their employees for professional liability in situations where the facts do not permit at least a reasonable inference of malpractice and to make possible the fair and equitable disposition of such claims against health care providers as are, or reasonably may be, well founded." Section 9–2–1502, W.S.1977.

From the record in this case before this court we cannot say that the act does not accomplish that purpose. Plaintiff has failed in her burden.

I would hold the Wyoming Medical Review Panel Act constitutional.